648 F.2d 863
 107 L.R.R.M. (BNA) 2258, 91 Lab.Cas. P 12,752
 UNITED STEELWORKERS OF AMERICA, AFL-CIO, and its Local,
Perth Amboy Smelter and Refinery Workers Union No.
365, both an unincorporated organization
of more than 7 persons
v.
AMERICAN SMELTING AND REFINING COMPANY and Federated Metals
Company, corporations authorized to do business in
the State of New Jersey, Appellants.
 No. 80-1587.
 United States Court of Appeals,
Third Circuit.
 Argued Jan. 13, 1981.
Decided April 28, 1981.
As Amended May 6, 1981.
 
 Edward F. Ryan (argued), Laurence Reich, Rosemary Alito Hall, Carpenter, Bennett & Morrissey, Newark, N.J., for appellants.
 Daniel P. McIntyre, Asst. Gen. Counsel, Pittsburgh, Pa. (argued), Emil Oxfeld, Arnold S. Cohen, Rothbard, Harris & Oxfeld, Newark, N.J., for appellees; Bernard Kleiman, Chicago, Ill., of counsel.
 Before SEITZ, Chief Judge, and ROSENN and SLOVITER, Circuit Judges.
 OPINION OF THE COURT
 SEITZ, Chief Judge.
 
 
 1
 Federated Metals Corporation appeals from an order of the district court ordering enforcement of the arbitration award on the motion of the United Steelworkers of America (the Union) for summary judgment.
 
 I.
 
 2
 The labor dispute and eventual plant shutdown involved in this case are detailed in Federated Metals Corp. v. United Steelworkers, 648 F.2d 856 (3d Cir. 1981), which we also decided today. To summarize briefly, when Federated Metals, a subsidiary of American Smelting & Refining Company (ASARCO), acquired ASARCO's plant at Perth Amboy, New Jersey, it assumed the collective bargaining agreement entered into between ASARCO and the Union.[1] This collective bargaining agreement was to expire on June 30, 1977. When the Union and Federated Metals failed to reach agreement on a new collective bargaining agreement by this date, the Union commenced an economic strike. After several months of unsuccessful negotiations, Federated Metals decided to close the plant. Federated Metals publicly announced this decision on January 11, 1978.
 
 
 3
 On January 19, 1978, the Union submitted to Federated Metals a claim for security and severance pay that it alleged was due the employees under the expired collective bargaining agreement.[2]
 
 
 4
 Federated Metals denied the Union's claim. According to Federated Metals, it was not obligated to honor these claims because the collective bargaining agreement on which they were based had expired. Alternatively, Federated Metals contended that the employees were not entitled to security and severance pay because they had not been laid off for lack of work.
 
 
 5
 The Union demanded arbitration. It based this demand upon the broad arbitration clause in the collective bargaining agreement, which provides:
 
 
 6
 A grievance is defined to be any controversy between the parties or between the Company and employees covered by this Agreement, (1) as to any matter relating to working conditions or wage rates not specifically covered by this Agreement; and (2) any matter involving the interpretation, application or violation of any provision of this Agreement.
 
 
 7
 Federated Metals refused to submit to arbitration because it believed that its duty to arbitrate did not survive the termination of the collective bargaining agreement. In support of this position, Federated Metals emphasized that when the parties had agreed to a permanent panel of five named arbitrators, they had stipulated in certain preliminary documents that "(t)hese arbitrators and this procedure shall continue for the term of the agreement, expiring June 30, 1977."[3]
 
 
 8
 The Union then sought to compel arbitration in a New Jersey state court. Federated Metals removed the proceeding to the United States District Court for the District of New Jersey. On July 18, 1978, the district court ordered that the question of arbitrability of the dispute over security and severance pay, as well as the merits of the dispute if it was found to be arbitrable, be submitted to an arbitrator.
 
 
 9
 Both parties agreed on an arbitrator. The arbitrator found that the security and severance pay dispute was arbitrable. Further, he found that Federated Metals owed security and severance pay to the employees under the expired agreement.
 
 
 10
 The Union filed suit in federal district court to enforce the arbitration award. Federated Metals counterclaimed to vacate the award. On the Union's motion for summary judgment, the district court ordered that the arbitration award be enforced.
 
 II.
 
 11
 We first address the Union's argument that Federated Metals' failure to appeal the July 18, 1978 order of the district court compelling arbitration of both the question of arbitrability and the underlying dispute precludes it from challenging the arbitrator's finding that the dispute was arbitrable. The district court order was a final order within the meaning of 28 U.S.C. § 1291 (1976), see, e. g., Goodall-Sanford, Inc. v. United Textile Workers, Local 1802, 353 U.S. 550, 551-52, 77 S.Ct. 920, 921, 1 L.Ed.2d 1031 (1957), which Federated Metals chose not to appeal.
 
 
 12
 We believe that the failure to appeal the July 18 order only precludes Federated Metals from challenging the district court's decision that the question of arbitrability was for the arbitrator. It does not foreclose Federated Metals' challenges to the arbitrator's rulings that the dispute was arbitrable and that Federated Metals was obligated to give the employees the security and severance pay. We recognize that a challenge to the July 18 order might have presented some issues similar to those raised by Federated Metals in this case. However, we believe that in this situation an order that the question of arbitrability is for the arbitrator is distinct from a decision that the underlying dispute is arbitrable. Thus, the failure to appeal the former does not foreclose a challenge to the latter.
 
 III.
 
 13
 Federated Metals argues that the arbitrator's decision that the dispute was arbitrable should be vacated because the Union did not assert the claim to security and severance pay within a reasonable time after the agreement had expired and because the arbitrator ignored the intent of the parties. When reviewing an arbitrator's ruling that a particular dispute is arbitrable, a court's role is even more circumscribed than it is when a court decides in the first instance whether a dispute is arbitrable, see, e. g., United Steelworkers v. Warrior & Gulf Navigation Corp., 363 U.S. 574, 582-83, 80 S.Ct. 1347, 1352-53, 4 L.Ed.2d 1409 (1960) (describing the court's role in determining questions of arbitrability). This is so because "the parties (have) excluded from court determination not merely the decision of the merits of the grievance but also the question of its arbitrability, vesting power to make both decisions in the arbitrator." Id. at 583 n.7, 80 S.Ct. at 1353 n.7.[4]
 
 
 14
 By committing the decision on arbitrability to the arbitrator, the parties have expressed their desire that the arbitrator use his or her knowledge of the "common law of the shop" and his or her personal judgment to consider criteria not expressly in the contract when deciding not only the merits of the dispute but also the question of arbitrability. Cf. United Steelworkers v. Warrior & Gulf Navigation Corp., 363 U.S. at 581-82, 80 S.Ct. at 1352 (delineating why parties prefer to commit disputes to an arbitrator). When the parties have committed questions of arbitrability to the arbitrator, the arbitrator's determination that a dispute is arbitrable under the arbitration clause of the contract may involve consideration of much the same factors as his or her interpretation of the contract provision that governs the merits of the dispute. Therefore, we review the arbitrator's decisions as to both arbitrability and the merits of the dispute by the same standard. We will not vacate the arbitration award unless it cannot in any rational way be derived from the collective bargaining agreement. See, e. g., Ludwig Honold Manufacturing Co. v. Fletcher, 405 F.2d 1123, 1128 (3d Cir. 1969).
 
 
 15
 We do not find persuasive Federated Metals' argument that this claim was untimely. Although the arbitrator did not specifically address this issue in his opinion, the district court found that there was no unreasonable delay. This claim arose when Federated Metals announced its decision to close the plant, and the Union filed its claim only eight days later. Under the circumstances of this case, we do not believe there was unreasonable delay. See e. g., Federated Metals Corp. v. United Steelworkers, 648 F.2d 856 (3d Cir. 1981); United Steelworkers v. Fort Pitt Steel Casting, 635 F.2d 1071 (3d Cir. 1980), petition for cert. filed, 49 U.S.L.W. 3727 (U.S. March 16, 1981) (No. 80-1564) (Fort Pitt II ).
 
 
 16
 Federated Metals advances two arguments to support its contention that the arbitrator's decision ignored the intent of the parties. First, it argues that the arbitrator exceeded his authority when he relied on Nolde Brothers, Inc. v. Local No. 358, Bakery & Confectionery Workers, 430 U.S. 243, 97 S.Ct. 1067, 51 L.Ed.2d 300 (1977), to reach his decision.
 
 
 17
 If Federated Metals is arguing that the arbitrator erred in considering Nolde at all, we do not accept this argument. As long as an arbitration award "draws its essence from the collective bargaining agreement," the arbitrator may look to sources other than the collective bargaining agreement for guidance in making that award. See, e. g., United Steelworkers v. Enterprise Wheel & Car Corp., 363 U.S. 593, 596-97, 80 S.Ct. 1358, 1360-61, 4 L.Ed.2d 1424 (1960). When deciding the arbitrability of a particular dispute, we believe that it is permissible for an arbitrator to look to the decisions of the United States Supreme Court discussing how courts should decide questions of arbitrability, particularly because the question of arbitrability is generally one that a court decides. Thus, the fact that the arbitrator relied on Nolde does not invalidate his decision.
 
 
 18
 On the other hand, Federated Metals may be arguing that the arbitrator completely ignored the intent of the parties because he incorrectly interpreted Nolde as establishing a conclusive presumption of postcontract arbitrability. We do not believe that this is a fair reading of the arbitrator's opinion. Moreover, even if we assume that such a reading of his opinion is plausible, this is not a sufficient ground for vacating his award if there are other plausible readings. When confronted with a similar contention, the Enterprise Wheel Court stated: "A mere ambiguity in the (arbitrator's) opinion accompanying an award, which permits the inference that the arbitrator may have exceeded his authority, is not a reason for refusing to enforce the award. Arbitrators have no obligation to the court to give their reasons for an award." 363 U.S. at 598, 80 S.Ct. at 1361. In this case, it is at least plausible to read the arbitrator's opinion as merely looking to Nolde as an appropriate guide to assist him in ascertaining the parties' intent and not as establishing a per se rule that the arbitration clause survives contract termination. Thus, we will not vacate the award on this ground.
 
 
 19
 Second, Federated Metals argues that because the parties agreed that their method of selecting an arbitrator would terminate when the collective bargaining agreement expired, they necessarily intended that the duty to arbitrate would also terminate at that time. Although the parties did not include a time limitation in the collective bargaining agreement itself, see note 3, supra, in preliminary memoranda and in certain statements made to the employees, they indicated that this procedure would only continue until the collective bargaining agreement expired. Federated Metals argues that if the method of arbitration terminates when the collective bargaining agreement expires, the agreement to arbitrate necessarily terminates also, because arbitration is nothing more than a method of settling disputes.
 
 
 20
 Although this is certainly one plausible interpretation of the parties' intent, it does not necessarily demonstrate that the arbitrator's determination that the duty to arbitrate survived contract termination was irrational. In answering this contention of Federated Metals, the arbitrator's opinion appears to be somewhat ambiguous. On the one hand, the arbitrator explicitly rejects the notion that the "bare use of named arbitrators" operated to exclude postexpiration disputes from arbitration, thus indicating that he believed there was no durational limit on even the method of selecting an arbitrator. This interpretation is rationally derived from the collective bargaining agreement because the arbitrator could have found that the failure to include the durational limitation in the arbitration clause of the collective bargaining agreement indicated that the parties did not intend this limitation to be part of their final, integrated agreement.
 
 
 21
 On the other hand, the arbitrator also draws a clear distinction between the obligation to arbitrate a dispute and the identity of or the method of selecting an arbitrator. The Union argues that when the parties agreed to this method of selecting arbitrators, they took pains to ensure that they could either replace the named arbitrators or change the method of selection when it was time to negotiate a new agreement. The Union maintains that the parties took these steps because they did not want to be eternally bound to the same five men. This is a plausible reading of the parties' intent. Because the arbitration clause provided no basis for excluding postexpiration disputes before the parties changed the method of selecting arbitrators, the arbitrator rationally could have concluded that the parties did not intend to achieve a different result when they adopted the use of a permanent panel.
 
 
 22
 We believe that either of the possible interpretations of the arbitrator's opinion is rationally derived from the arbitration clause of the collective bargaining agreement. Therefore, we will not vacate the award on the ground that the dispute was nonarbitrable.
 
 IV.
 
 23
 Federated Metals also advances several reasons why the arbitrator exceeded his authority when he found that Federated Metals owed the employees security and severance pay. Federated Metals argues that the arbitrator added to the agreement by awarding the security and severance pay because the agreement only provides for such pay when employees are laid off for lack of work.[5] It argues that a plant shutdown is not a layoff. Further, it contends that the plant closed either because of the strike or because the parties could not agree to a collective bargaining agreement, not because there was a lack of work.
 
 
 24
 Although these are forceful arguments as a matter of contract interpretation, courts are not free to refuse to vacate arbitration awards merely because they might have interpreted the contract differently were it up to them in the first instance. We will not vacate the arbitration award unless Federated Metals demonstrates that it is not in any rational way derived from the collective bargaining agreement.
 
 
 25
 The arbitrator first looked to other arbitration decisions interpreting the term "layoff" to determine whether "layoff" embraces permanent severance when the plant closes. He found that the question was not settled, so he looked for more direct evidence of the parties' intent. He considered the conduct of ASARCO, who had negotiated the collective bargaining agreement, when it closed the major portion of its Perth Amboy facility.[6] The arbitrator reasoned:
 
 
 26
 To my mind what is significant is that under the same contract and same contract provision, Federated's parent, ASARCO some months earlier closed a large portion of its operation at this location, and made security and severance payments under Article XV of the contract to its employees whose jobs ended and who were not retained in employment for certain continuing operations by Federated. Because I do not find any significant difference between the plant closing of ASARCO and the later cessation of operations by Federated, I judge the application of Article XV of the contract by ASARCO to have a precedential effect on the closing of its subsidiary, Federated. I conclude that both closed down essentially for economic reasons; that the employees of both lost their jobs under similar conditions and that how ASARCO, under Article XV, treated those employees whose jobs ended is, both contractually and equitably the way Federated, who undisputedly assumed ASARCO's collective bargaining agreement with the Union covering the instant affected (employees,) should have treated its employees when it closed.
 
 
 27
 We do not believe that this reasoning exhibits a manifest disregard for the collective bargaining agreement. To the contrary, it appears that the arbitrator properly considered both existing arbitration decisions and the conduct of the parties to the agreement in a similar situation to ascertain the meaning of the contract language. It was rational to conclude that the parties intended that "layoff" would encompass the plant shutdown, as well as temporary layoffs, and that severance pay should be provided in both situations.
 
 
 28
 Further, we believe that the arbitrator's ruling that the term "lack of work" covered the plant closing in this case was also rationally related to the collective bargaining agreement. In so ruling, the arbitrator compared the reasons for this closing with the reasons for ASARCO's closing of its facility. He reasoned that ASARCO shut down its operations for essentially economic reasons, which would not fit within Federated Metals' narrow interpretation of "lack of work" as meaning only low demand or lack of orders. It is a rational reading of the clause to determine that the parties intended to distinguish economic layoffs or terminations from those for disciplinary reasons, and to award severance pay for the former whether they be occasioned by low demand or high production costs.
 
 
 29
 Having concluded that the parties intended that "lack of work" would encompass all economic layoffs, the arbitrator then compared Federated Metals' closing with that of ASARCO. In so doing, he refused to accept Federated Metals argument that this situation was different from the ASARCO shutdown because the Union caused the shutdown by going on strike. Federated Metals asserts that the arbitrator's failure to consider the strike as the cause of the shutdown was in manifest disregard of the collective bargaining agreement. The arbitrator refused to consider the strike because he believed that both the Union's strike and Federated Metals' decision to shut down were lawful economic actions and that neither party should suffer prejudice or obtain benefit from these actions. Thus, he did "not deem them determinative or even probative."
 
 
 30
 We conclude that this decision was not in manifest disregard of the collective bargaining agreement. If the severance-pay provision is intended to encompass terminations for economic reasons, as opposed to disciplinary reasons, this plant closing is covered. Presumably, Federated Metals closed the plant because it could not afford the Union's demands. High labor costs are economic reasons, and the fact that the employees engaged in a lawful strike in support of their bargaining position should not deprive them of a benefit to which they would otherwise be entitled.
 
 
 31
 Finally, Federated Metals argues that even if the employees were entitled to severance pay, they were not entitled to security pay. Thus, the arbitrator added to the agreement by awarding both. Federated Metals bases this argument on the fact that the security pay was nonaccruable, and therefore, unlike the accrued severance pay, the employees did not "earn" the security pay until they were terminated. Federated Metals reasons from this that the employees could not recover such pay, presumably as a matter of law.
 
 
 32
 At the outset, we note that this argument apparently was not presented to the arbitrator. The Union so states in its brief and we do not read Federated Metals' response as negating this contention. We have reviewed the transcript of the arbitration proceeding that was included in the record on appeal and we do not believe that Federated Metals can fairly be said to have advanced this argument as a separate contention. One of the primary purposes of arbitration is to settle labor disputes quickly and finally. Thus, we do not believe it appropriate for a party to argue that an arbitration award is irrational because it fails to consider an interpretation of the contract that they failed to unambiguously advance during the arbitration proceeding. See generally Amalgamated Meat Cutters & Butcher Workmen v. Cross Brothers Meat Packers, Inc., 518 F.2d 1113, 1121 (3d Cir. 1975).
 
 
 33
 In any event, assuming that it is appropriate for us to consider this argument, we do not believe that it would warrant a district court's refusal to enforce the arbitration award. As we noted earlier, arbitrators have no obligation to state their reasons for an award. See Enterprise Wheel, 363 U.S. at 598, 80 S.Ct. at 1361. Therefore, we will enforce an arbitration award if it is rationally related to the collective bargaining agreement. We cannot say that the failure to separate security pay from severance pay was irrational. First, Article XV of the collective bargaining agreement does not explicitly segregate security pay from severance pay. Second, even though Federated Metals' interpretation of the security-and-severance-pay provision, which is persuasively developed in the dissent, is not unreasonable, it does not follow that the arbitration award is irrational. We believe that whether the parties intended to allow the accrual of benefits after termination is a matter of contract interpretation, which in this case was to be decided by the arbitrator, and such accrual, in our view, is not foreclosed as a matter of law. See, e. g., Federated Metals Corp. v. United Steelworkers, 648 F.2d 856 (3d Cir. 1981) and cases cited therein.
 
 
 34
 We conclude that Federated Metals has not demonstrated that the arbitrator's decision was not rationally related to the agreement. Therefore, we will not vacate the arbitration award.
 
 V.
 
 35
 We find that Federated Metals is not precluded from challenging the rulings of the arbitrator on both arbitrability and the merits of the dispute. Further, we conclude that the district court was correct in rejecting Federated Metals' contention that the dispute was nonarbitrable. Finally, we uphold the district court's conclusion that the arbitration award of security and severance pay draws its essence from the collective bargaining agreement, and thus should not be vacated.
 
 VI.
 
 36
 The order of the district court ordering enforcement of the arbitration award will be affirmed.
 
 
 37
 ROSENN, Circuit Judge, dissenting.
 
 
 38
 I agree with the majority that the question of arbitrability is for the arbitrator and that the disputes are arbitrable. However, I perceive no rational basis for the arbitrator's award of benefits to employees who were permanently terminated, rather than laid off, more than six months after expiration of the contract from which those benefits are alleged to flow. I therefore dissent from that portion of the majority opinion holding that the arbitration award draws its essence from the collective bargaining agreement and should be enforced.
 
 I.
 
 39
 The Union and Employer entered into a collective bargaining agreement which terminated on June 30, 1977. Article XV of that agreement established a "Security and Severance Plan" which provided for payments to employees separated from employment due to layoffs for lack of work, retirement, permanent and total disability, or death. Article XV provides:
 
 Article XV: Security and Severance Plan
 Effective July 1, 1974:
 FORMULA:
 
 40
 1% of Average Annual Earnings times Years of Service, plus $30.00 times Years of Service. (Annual Earnings : Straight time hourly earnings, which shall exclude all pay premiums of whatever nature, for the twelve consecutive calendar months immediately preceding date of lay-off, retirement, or death, divided by the straight time hours worked, multiplied by 2,080 hours.
 
 ELIGIBLE:
 
 41
 All employees upon completion of Two (2) Years Service. (All "Years Service" shall be based on the Plant's Seniority Lists).
 
 PAYMENTS:
 
 42
 Laid-Off Employees (for lack of work only): After 14 calendar days on layoff, $50.00/week until either:
 
 
 43
 (a) Employee is recalled.
 
 
 44
 (b) Exhaustion of his amount accrued by Formula; provided, however, that the first twelve (12) weekly payments (if the employee is laid off that long) shall not be deducted from his amount accrued by Formula nor for those weeks for which the employee received State Unemployment Compensation.
 
 
 45
 (c) 52 weeks,
 
 
 46
 whichever first occurs.
 
 
 47
 In the event of (c) and an amount accrued remains, the employee shall have the option of: the remaining amount continuing on accrual; or receiving the remaining amount accrued in a lump sum payment.
 
 Payments shall be made without regard to:
 
 48
 (1) Any other benefit or payment received by the employee.
 
 
 49
 (2) His employment status except as covered in (a) above.
 
 
 50
 An employee laid-off, recalled before (b) occurs and subsequently laid off, shall have an accrued amount based on total years of service (figured to nearest complete calendar quarter) less total deducted payments received.Pensioned Employees : At date of retirement under Company's Retirement Plan, or on the date of his established eligibility for benefits under the Company's Plan of Permanent and Total Disability Benefits, the employee shall have the amount accrued by Formula less total payment received, if any. Retirement benefits shall reflect only laid-off benefit payments deducted; however, the first twelve (12) weekly payments (if the employee is laid-off that long) shall not be deducted from his amount accrued by the Formula nor for those weeks for which the employee received State Unemployment Compensation.
 
 
 51
 Death of an Employee : Upon the death of an employee his designated beneficiary shall receive an amount determined by Formula based on the employee's status at date of death....
 
 
 52
 Employees separated for any reason other than lay-off, retirement, permanent and total disability or death shall not receive any payments.
 
 
 53
 After the plant closed in January 1978, following a six month strike, the Union filed a request with the Company for benefits under this provision on behalf of approximately 94 employees. The request was denied and, after the various proceedings detailed in the majority opinion, the Union won an arbitrator's award, which was enforced by the district court. At no time did the Union offer any source for the employees' entitlement to these benefits other than the above-quoted Article XV of the contract. The Company's position throughout this dispute has been that the employees are not entitled to benefits because: (1) they were not laid off for lack of work, but instead had been permanently separated from employment due to the closure of the Perth Amboy plant, and (2) even if the employees' terminations could properly be classified as layoffs for lack of work, no right to security benefits ever arose because those "layoffs" did not occur until more than six months after the contract expired.
 
 
 54
 The arbitrator found that "the employees were not at work, presumably would not have accepted work even if made available unless a new contract with acceptable terms had been agreed upon and hence may be deemed to have contributed to or shared in some of the responsibility for the plant closing." Nonetheless, he directed payment of benefits under Article XV because:
 
 
 55
 (1) Having concluded that the strike and plant closing were both apparently lawful economic actions, he believed it would be improper if either side gained a benefit or suffered prejudice as a result.
 
 
 56
 (2) He found it significant that, under the terms of the same contract, Federated Metals' parent, ASARCO, had some months earlier closed a substantial part of its operations at Perth Amboy and had paid the benefits described in Article XV to those employees whose jobs were terminated and who were not retained "for certain continuing operations by Federated." The arbitrator found "no significant difference" between the plant closing of ASARCO and that of Federated. He concluded that both operations were closed down essentially for economic reasons and that the employees of both had lost their jobs under similar conditions. Thus, he concluded that ASARCO's application of Article XV to the earlier closing had "precedential effect on the closing of its subsidiary, Federated."
 
 
 57
 Citing Ludwig Honold Manufacturing Co. v. Fletcher, 405 F.2d 1123 (3d Cir. 1969), the district court held that it could not say that the arbitrator's award was in no rational way derived from the agreement. The district court did not address Federated Metals' contention that the termination of employment due to permanent plant closure does not constitute a layoff for lack of work, the contractual prerequisite to invocation of Article XV. Nonetheless, it granted the plaintiffs' motion for summary judgment and enforced the arbitrator's award. It denied the Company's motion for summary judgment.
 
 II.
 
 58
 If these employees have a right to the benefits awarded by the arbitrator, it is undisputed that the right stems from Article XV. The interpretation of the article is for the arbitrator and he brings to the task his informed judgment. However, he is not free to romp wherever his fantasies take him in ascertaining the intentions of the parties. He is "confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice (and) his award is legitimate only so long as it draws its essence from the collective bargaining agreement." United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960). Of course, he may look to other sources for guidance, but unless the arbitrator manifests a fidelity to his obligation, a court must refuse to enforce the award. Id. See Ludwig Honold Manufacturing Co. v. Fletcher, 405 F.2d 1123, 1128 (3d Cir. 1969).
 
 
 59
 Article XV is a fairly complex contract provision and a failure to analyze carefully its intended manner of operation accounts for what is, in my view, the erroneous decision reached by the arbitrator and approved by the district court. Although it is true, as the majority asserts, that Article XV "does not explicitly segregate security pay from severance pay," maj. op., supra at 870, I believe the two types of benefits are sufficiently dissimilar contractual concepts that they must be treated separately under the law. The distinction to be drawn between the two is that severance pay is "earned" during the employee's length of service and security pay is not. In re Public Ledger, 161 F.2d 762, 773 (3d Cir. 1947).
 
 
 60
 Under Article XV, "severance pay" consists of a fund, the size of which is determined by use of the contractual formula in Article XV, which grows as an employee accumulates Years of Service. The article provides that an employee may draw upon his severance pay fund in only four situations. In the event of retirement, disability, or death, an employee may receive his severance pay fund in a lump amount. If an employee is laid off due to lack of work, he may draw weekly payments, in $50.00 increments, from his fund for those weeks in which he receives neither security pay, as described below, nor State Unemployment Compensation. No weekly payments may be drawn, however, more than a year after the layoff occurred and, within that year, payments may not be drawn if the employee has been recalled to work.
 
 
 61
 Security pay, on the other hand, does not vary in amount or availability according to an employee's length of service. Any and all workers who meet the threshold requirement of two years' service (also required for severance pay) receive security pay in the event they are laid off due to lack of work. Security pay also takes the form of $50.00 weekly payments, but is made only during the twelve weeks of layoff following the initial waiting period, and in those weeks in which the employee is receiving State Unemployment Compensation.
 
 
 62
 No one contends that these employees retired, died, or were permanently and totally disabled. Thus, they were not entitled to any benefits under Article XV unless they were laid off for lack of work. The question before us, then, is whether the arbitrator's conclusion that these employees were laid off for lack of work is a rational application of the terms of the contract.
 
 
 63
 I first register my strong objection to the arbitrator's implied acceptance of the Union's argument that the closing of the plant constituted "lack of work" under the contract resulting in the employees' loss of jobs. This is mere sophistry, particularly on this record in which it is undisputed that, had the workers ended their strike, the plant had orders to fill and work available.[1] The arbitrator's conclusion that the employees should suffer no detriment as a result of their lawful economic action the strike is a clear example of an arbitrator "dispens(ing) his own brand of industrial justice." United Steelworkers of America v. Enterprise Wheel & Car Corp., supra, 363 U.S. at 597, 80 S.Ct. at 1361. The critical factor in resolving the case before him should have been what the parties intended when they agreed to include Article XV in their collective bargaining agreement. The arbitrator's decision shows no analysis of the pertinent contractual provisions. He is free to bring his special expertise to bear on the issues, but if his conclusion does not "draw its essence" from the contract, we cannot enforce his award. The Perth Amboy plant was closed because the Company could not reach an accord with the Union and that is why these employees lost their jobs. I have no hesitation in rejecting as not derived from the contract any conclusion of the arbitrator that interprets "laid off (for lack of work only)" to include permanent terminations of employment resulting from a strike-induced plant closing.
 
 
 64
 I also disagree with the conclusion of the majority that the arbitrator rationally concluded that these employees were "laid off." In industrial relations, "layoff" is commonly used to describe a temporary suspension of an employee's work that leaves the continuing employment relationship unaffected. Fishgold v. Sullivan Drydock and Repair Corp., 328 U.S. 275, 287, 66 S.Ct. 1105, 1112, 90 L.Ed. 1230 (1946).[2] As the essence of Article XV discloses, "inherent in the term is the anticipation of recall." CBS Inc. v. International Photographers of the Motion Picture Industry, Local 644, 603 F.2d 1061, 1063 (2d Cir. 1979). In connection with Michigan's statutory unemployment compensation program, the Michigan Supreme Court has been called upon to define "layoff" and it too has iterated the essential element of temporary suspension of work or employment, not permanent separation. Thus, in General Motors Corp. v. Erves, 399 Mich. 241, 249 N.W.2d 41 (1976), the court concluded that a layoff "is a temporary dismissal by the employer which anticipates reemployment and therefore is distinguished from unemployment by reason of discharge, resignation, or other permanent termination." Id. at 46 (emphasis supplied). Accord, Irwin v. Globe-Democrat Publishing Co., 368 S.W.2d 452, 455 (Mo.1963).
 
 
 65
 There is a parallel between the case at bar and Irwin v. Globe-Democrat Publishing Co., supra. In Irwin, seventeen employees were awarded "dismissal pay" pursuant to a collective bargaining agreement between their union and the employer. During a strike by the St. Louis Newspaper Guild at its plant, the newspaper employer, the Globe-Democrat Publishing Co., sold all of its physical facilities to the St. Louis Post Dispatch and agreed to operate the plant for the latter upon the conclusion of the strike. Upon the termination of the strike plaintiffs offered to return to work but were advised that they were no longer employed by the Globe-Democrat. The plaintiffs contended they were entitled to "dismissal pay" under the collective bargaining agreement because there had been a layoff to reduce the work force. Like the Union in the case at bar, the plaintiffs in Irwin argued that the reduction in work force was necessitated by the newspaper's sale of "the tools 'necessary to' 'the printing of its newspaper.' " 368 S.W.2d at 454. The trial court agreed with this assessment.
 
 
 66
 On appeal, the Missouri Supreme Court observed that the term "layoff" had a well-defined meaning in the field of employment, that it did not mean termination of employment, but rather meant suspension of work or employment during a part or season of the year. It therefore held that an employee "laid off" did not have his employment status completely and finally terminated, that the termination of plaintiffs' employment was permanent and that therefore plaintiffs had been discharged. Accordingly, the court reversed the award of "dismissal pay."
 
 
 67
 Article XV itself clearly demonstrates that "layoff" was there used in the sense of a temporary separation from work. First, of course, the relevant provision of the Article anticipates a continuing relationship between the laid-off employee and the Company. Payments may be stretched out over the course of a year. Further, at the end of that year, the employee may leave funds "on accrual" with the Company, presumably to be later used in case of subsequent layoffs, or as severance pay should one of the three enumerated events come to pass. The provision also directs that payments should cease if the employee is recalled. Finally, even if the contractual language were to authorize a lump sum payment on permanent termination, the amount due the former employee under the "layoff" provision cannot be calculated until one year has passed. There is no way of knowing, at the time of separation, for how many of the coming weeks the employee will receive State Unemployment Compensation.[3] Yet for each of these weeks, a "laid off" employee is entitled to $50.00 without having it set off against the formula amount.
 
 
 68
 What the arbitrator had before him was a total and permanent severance of employment, squarely within the ambit of the contractual prohibition that employees separated "for any reason other than layoff, retirement, permanent and total disability or death shall not receive any payment." However, rather than analyze the contract to discover its intent, the arbitrator focused on the actions of ASARCO, Federated Metal's parent company, when it closed a portion of the Perth Amboy works earlier in 1977. He considered "significant" the fact that "under the same contract and identical contract provision," ASARCO made "security and severance payments" to those employees whose jobs ended and who were not retained in employment for certain continuing operations. Besides the obvious difference that the ASARCO contract was in force during the earlier closing of operations, which I shall discuss later, the arbitrator's reliance on the parent company's earlier action was improper. Although there was some evidence that the partial closure resulted from outmoded equipment and inadequate physical facilities, there is no indication that the affected employees were not actually placed on layoff status, subject to recall for the "continuing operations." Nor is there any indication in the record that whatever benefits were distributed by ASARCO flowed from Article XV. As I have shown, the layoff benefit provision of the Article does not provide for lump sum payments or, in fact, any payments until at least two weeks have passed. If immediate lump sum payments were made, it was in patent disregard of the contract. It may well be that any benefits made available flowed less from the contract than from other considerations not apparent on this record. A holding that once an employer, regardless of the reasons, gratuitously grants benefits not provided for by contract, he may not thereafter deny other workers those benefits, may reward some employees at the moment, but in the long run may seriously damage their cause.
 
 III.
 
 69
 Perhaps even more disturbing than the arbitrator's conclusion that these employees were laid off for lack of work is his total lack of attention to the expiration of the collective bargaining agreement more than six months before the right to benefits allegedly accrued. Although the majority addresses this issue with the questionable statement that "whether the parties intended to allow the accrual of benefits after termination is a matter of contract interpretation, which in this case was to be decided by the arbitrator," maj. op., supra at 870, I find it difficult to accept a conclusion that the arbitrator engaged in any contract interpretation to reach his result. Contract interpretation entails an analysis of language and a consideration of the circumstances under which an agreement was negotiated. Neither the arbitrator's award nor his questions to counsel at the arbitration hearing indicate any recognition of the expiration issue. Although he rightly concluded, after proper analysis, that the duty to arbitrate survived, his award gives no indication that he engaged in similar analysis of the survivability of Article XV. The two issues are distinct and are controlled by different principles. Nolde Brothers, Inc. v. Local No. 358, Bakery & Confectionery Workers Union, 430 U.S. 243, 97 S.Ct. 1067, 51 L.Ed.2d 300 (1977), created a presumption of survivability for arbitration clauses because such a rule significantly advances an important federal labor policy. See Steelworkers Trilogy, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960). No such presumption applies to Article XV. Whether the substantive provisions of that Article survived contract termination depends solely upon the parties' intentions and whether they are expressed in the contract. Had the arbitrator considered the issue of survivability in the context of the benefits provisions, as he did in connection with the issue of arbitrability, he would have found nothing whatsoever in the terms of the contract that showed the parties intended continuation of security pay after the termination of the contract.
 
 
 70
 The majority states that "whether the parties intended to allow the accrual of benefits after (contract) termination is a matter of contract interpretation, which in this case was to be decided by the arbitrator, and such accrual, in our view, is not foreclosed as a matter of law. See, e. g., Federated Metals Corp. v. United Steelworkers, 648 F.2d 856 (3d Cir. 1981) and cases cited therein." Maj. op., supra at 870 (emphasis added). I am unable to agree that this is an accurate statement of the law or that the cases relied upon support it. According to Webster's Third New International Dictionary, at 13 (1966), the primary definition of "accrue" is "to come into existence as an enforceable claim: vest as a right " Thus, the majority would permit an expired contract to confer wholly new rights on parties long after the relationship created by the contract has been extinguished. I know no principle of contract law that supports such a result.
 
 
 71
 As I note in my concurrence in Federated Metals, the companion case on which the majority relies, the language to which this majority refers is dictum, because the court was not called upon to review the merits of the underlying pension and disability claims. Further, neither United Steelworkers of America v. Fort Pitt Steel Casting, 598 F.2d 1273 (3d Cir. 1979), nor Local No. 595, International Association of Machinists v. Howe Sound Co., 350 F.2d 508 (3d Cir. 1965), lend credence to the majority's conclusion that rights may be accrued under an expired contract. In Fort Pitt, the company expressly obligated itself in the collective bargaining agreement to continue the employee's health insurance coverage after contract termination. 598 F.2d at 1276. The case actually dealt with a specific continuing obligation which, by its own express terms, survived expiration of the underlying contract. The parties presently before the court were aware of this alternative. In Article X, section 10(f) they made a similar provision for continued health insurance coverage in the event of a strike. No such provision was made for security benefits.
 
 
 72
 In Howe Sound, notwithstanding the court's inappropriate use of the term "accrue," 350 F.2d at 511, it is clear from reading the case that the rights to holiday and pro-rata vacation pay "accrued" during the term of the contract. The holiday pay was sought for Thanksgiving Day, November 22, 1962. The claimants were employees who had been terminated when the contract expired on October 30, 1962. They were entitled to holiday pay, however, because the contract provided that "(h)oliday pay shall be paid to employees when such employee has worked within thirty (30) days of any such Holiday." 350 F.2d at 510 n.1. Thus, the workers' rights to holiday pay accrued under the contract on October 23, 1962 during the life of the contract even though the benefit was to be enjoyed after contract termination. Such a contractual arrangement is common and in accord with the law. See John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 555, 84 S.Ct. 909, 917, 11 L.Ed.2d 898 (1964).
 
 
 73
 In the district court the Company contended, as it does before this court, that security benefits are claimed on the assumption that there was a layoff in 1978 when the plant was closed and the employees were separated. At that time, the Company contends, the collective bargaining agreement was no longer in effect and there could be no entitlement under it to security pay. The district court found no merit in this contention on the ground, citing Local 7-644, Oil, Chemical and Atomic Workers International Union v. Mobil Oil Co., 350 F.2d 708 (7th Cir. 1965), cert. denied, 382 U.S. 986, 86 S.Ct. 563, 15 L.Ed.2d 474 (1966), that a termination of the employer-employee relationship does not "vitiate the continued service of an employee."
 
 
 74
 The district court may be correct as an abstract matter of law, but the principle has no application to the facts of this case. The issue here is not whether an employee, who returns to work following an absence because of a strike, has suffered a break in service which adversely affects his seniority rights or accrued pension benefits. The question here is whether the opportunity to "earn" rights to benefits while on layoff, as distinguished from the right to enjoy benefits already earned and vested, survives contract termination. Inasmuch as that opportunity was purely a creation of the collective bargaining contract, it is extinguished when that contract ceases to be operative. On June 30, 1977, the collective bargaining agreement between these parties had conferred all the rights it was going to confer, imposed all the obligations it was going to impose. Thus, as we observed in Sun Oil Co. v. NLRB, 576 F.2d 553, 558 (3d Cir. 1978):
 
 
 75
 Except in limited circumstances not applicable here, Nolde Brothers v. Bakery and Confectionery Workers Union, 430 U.S. 243 (97 S.Ct. 1067, 51 L.Ed.2d 300) (1977), an employer is not bound by the terms of a collective bargaining agreement once that agreement has terminated.
 
 
 76
 The issues in this case bear a remarkable similarity to those in Owens v. Press Publishing Co., 20 N.J. 537, 120 A.2d 442 (1956). In Owens, the collective bargaining agreement established a right to severance pay when employees left the company for any reason other than gross misconduct. The amount of severance pay equalled one week's pay per six months of service. The collective bargaining agreement, containing the severance pay clause, expired by its terms on August 22, 1952. The claimants in the case were former company employees who had been separated from their jobs, for reasons other than gross misconduct, in the months of January, February and May of 1953. The claimants sought severance pay in an amount calculated using their entire length of service, including those months after the contract had expired.
 
 
 77
 The New Jersey Supreme Court held the former employees entitled to severance pay in amounts corresponding to their length of service as of August 22, 1952, when the collective bargaining agreement expired. In so holding, the court rejected the company's argument that the pay was not due unless the separations came during the life of the agreement:
 
 
 78
 (T)he right to such pay can "arise" only during the subsistence of the contract so providing, and not after its termination; but once the right thus comes into being it will survive the termination of the agreement.
 
 
 79
 120 A.2d at 448. The court, however, also rejected the former workers' claims that they had earned severance benefits after August 22, 1952. The court noted thatthe right to separation pay was a creature of the collective bargaining agreement alone, a consensual undertaking limited to a fixed term; and it is fundamental in the law of contracts that upon the expiration of the period thus prescribed the agreement ceased to exist and its provisions had no in futuro force and effect.
 
 
 80
 Id. In the two quoted passages, the New Jersey court was announcing basic principles of law. Although Owens was not a review of an arbitration award, the principles of law set out above are of concern to us in determining whether the award presently before this court "drew its essence from the collective bargaining agreement." See Ludwig Honold Manufacturing Co. v. Fletcher, 405 F.2d 1123, 1128 (3d Cir. 1969). See also International Union of United Brewery, Flour, Cereal, Soft Drink, and Distillery Workers of America v. Duke and Company, Inc., 373 F.Supp. 778 (W.D.Pa.), aff'd, 510 F.2d 969 (3d Cir. 1975) (rights and duties of parties arising out of employment relationship are strictly controlled by the terms of a collective bargaining agreement and duty to continue pension plan does not survive plant's closing); Baker v. Fleet Maintenance Inc., 409 F.2d 551, 554 (7th Cir. 1969) (when collective bargaining agreement has expired by its terms, it will not support claims for post-expiration wrongful discharge).[4]
 
 
 81
 In the case at bar, each employee, as he accumulated years of service, accrued a right under Article XV to receive severance pay if he retired, became disabled, or died. This also entitled him to have those same funds distributed in weekly payments in the event of layoff. The right to that benefit could accrue only during the contract's life and the right so accrued was limited. Article XV expressly conditioned its exercise on the occurrence of layoff, death, disability, or retirement. As pointed out in part II supra, I do not believe that any of these events occurred and, thus, the condition precedent to these employees' exercise of their accrued rights has not been met.
 
 
 82
 Even assuming, however, that these employees could be considered to have been "laid off," and thus entitled to exercise their accrued rights to severance pay, they were not entitled to an award of security pay. Article XV provides no mechanism by which an employee can accrue rights to security benefits. Thus, security benefits are no more than an expectancy under the contract and may be exercised as a right only at the time when the employee is laid off for lack of work. The events, therefore, that give rise to the right to security pay under Article XV must occur during the life of the contract. This requirement has not been met.
 
 IV.
 
 83
 For the foregoing reasons, I conclude that the arbitrator's award does not draw its essence from the collective bargaining agreement. I further conclude that these employees were not laid off for lack of work and are therefore not entitled to the benefits awarded by the arbitrator. Alternatively, I conclude that even if they were laid off, the employees had no accrued or vested right to security pay. Thus, the award should not be enforced.
 
 
 
 [1]
 ASARCO was made a party to this action solely because it owns Federated Metals. It was eliminated from the arbitration proceeding by stipulation of the parties
 
 
 [2]
 The security and severance pay provision provides:
 ELIGIBLE
 All employees upon completion of Two (2) Years Service. (All "Years Service" shall be based on the Plant's Seniority Lists).
 PAYMENTS
 Laid-off Employees (for lack of work only): After 14 calendar days on lay-off, $50.00/week until either:
 (a) Employee is recalled.
 (b) Exhaustion of his amount accrued by Formula;
 (c) Fifty-two weeks,
 whichever first occurs.
 (Emphasis in original).
 
 
 [3]
 The collective bargaining agreement itself does not contain a limitation on the terms of the arbitrators. It merely provides:
 In the event that any such grievance, dispute or controversy shall not be settled in the manner provided above, either party may request that it be submitted to arbitration before a single arbitrator selected from the panel listed below:
 (Then followed a list of five names)
 These arbitrators shall be selected in rotation. If the Arbitrator selected is then unavailable within sixty (60) days, or declines to serve, the next Arbitrator shall be selected.
 
 
 [4]
 As we noted supra, Federated Metals' failure to appeal the July 18 order precludes it from challenging that court's determination that the parties clearly demonstrated their agreement to have an arbitrator decide the question of arbitrability
 
 
 [5]
 The security and severance pay provision is detailed in note 2, supra
 
 
 [6]
 Federated Metals also asserts that the arbitrator exceeded his authority by considering the conduct of ASARCO at all in making his decision. However, as we noted earlier, the arbitrator may look to sources other than the collective bargaining agreement for guidance as long as the arbitration award "draws its essence from the collective bargaining agreement." United Steelworkers v. Enterprise Wheel & Car Corp., 363 U.S. 593, 596-97, 80 S.Ct. 1358, 1360-61, 4 L.Ed.2d 1424 (1960)
 
 
 [1]
 At the arbitration hearing the following exchange took place between counsel for the parties:
 MR. RYAN (Company counsel): Would you consider, Emil, that there was sufficient work at the Perth Amboy operation of the Rod and Tube and lead products, assuming we could have reached a satisfactory collective bargaining agreement?
 MR. OXFELD (Union counsel): Sure. I will concede that. Of course. Sure there was work. As I said, in fact, I am sure there has been work at all times in all the operations. Whether it was economically feasible is something we have no concern with because we don't participate in that judgment.
 
 
 [2]
 The Court in Fishgold quoted with approval the Oxford English Dictionary definition of layoff as "(a) period during which a workman is temporarily dismissed or allowed to leave his work; that part or season of the year during which activity in a particular business or game is partly or completely suspended; an off-season." 328 U.S. at 287 n.11, 66 S.Ct. at 1112 n.11
 
 
 [3]
 In recent years, Supplemental Unemployment Benefit (SUB) plans have become popular in the automobile and steel industries. They provide employer-financed benefits to supplement state unemployment insurance benefits and Article XV is a variation of a SUB plan. See BNA LRX 916
 
 
 [4]
 These same principles led courts initially to reject claims that a duty to arbitrate disputes survived contract expiration. See, e. g., Proctor & Gamble Ind. Union v. Proctor & Gamble Mfg. Co., 312 F.2d 181 (2d Cir. 1962), cert. denied, 374 U.S. 830, 83 S.Ct. 1872, 10 L.Ed.2d 1053 (1963). The Supreme Court has, of course, since identified an important federal labor policy that operates to create a presumption that the parties intended arbitration clauses to survive contract termination. Nolde Bros., Inc. v. Local 358, Bakery & Confectionery Workers Union, 430 U.S. 243, 97 S.Ct. 1067, 51 L.Ed.2d 300 (1977)
 The Union relies on Nolde in support of its claim that security pay survives contract termination. As pointed out in the text, Nolde relied heavily on the strong federal policy in favor of arbitration in extending the life of the contract clause at issue in that case. No such federal policy operates to presume the survivability of security pay clauses. Nolde is relevant only to the preliminary question of arbitrability, an issue on which we have unanimously found in favor of the Union.