STATE OF NEW JERSEY, DEPARTMENT OF LAW AND PUBLIC SAFETY, DIVISION OF STATE POLICE, PLAINTIFF-APPELLANT, v. STATE TROOPERS FRATERNAL ASSOCIATION OF NEW JERSEY, INC., DEFENDANT-RESPONDENT.

Argued September 29, 1982—Decided December 22, 1982.

*James J. Ciancia,* Assistant Attorney General, argued the cause for appellant (*Irwin I. Kimmelman,* Attorney General of New Jersey, attorney; *Erminie L. Conley,* Assistant Attorney General, of counsel and on the brief).

*Jerome J. La Penna* argued the cause for respondent (*Cerreto & La Penna,* attorneys).

The opinion of the Court was delivered by

O'HERN, J.

The question is whether a legislative change of a state health benefits program applies to a collective negotiations agreement reached before the legislative change. Based on the language of the collective agreement, we hold that the change applies and reverse the judgment of the Appellate Division.

Defendant State Troopers Fraternal Association of New Jersey, Inc., the exclusive representative of the unit of employees representing State Troopers employed by the State of New Jersey, entered a collective agreement with the State covering a two-year term commencing July 1, 1978. The agreement provided for the Troopers to participate in the State's Prescription Drug Program, which is a statewide program of health benefits applicable to all State employees and their dependents. As that program existed on July 1, 1978, the State would pay the cost of

eligible prescription drugs, but the employee would pay a deductible of $1.25 on each prescription.[1]

On June 28, 1979, the Legislature enacted its annual Appropriation Act and allocated funds for the program in a line item called "Prescription drug program." *L.*1979, *c.* 119, p. 119. The bill provided that "[t]he amount hereinabove for Prescription drug program is based upon a copayment of $2.50 for each eligible prescription." *L.*1979, *c.* 119, p. 121. As a consequence, the Division of State Police changed the deductible from $1.25 to $2.50, effective during the second year of the collective negotiations agreement.

The Association filed a grievance alleging that the change in copayment violated the collective agreement, specifically asserting a violation of Article XXV, Section B of the agreement, which states:

> The State agrees that all mandatorily negotiable benefits, terms and conditions of employment relating to the status of Troopers of the Division of State Police covered by this Agreement shall be maintained at standards existing at the time of the agreement.

The grievance procedure produced no resolution and the matter was submitted to arbitration.

Before the arbitrator, the State argued that the 1979–1980 Appropriation Act changed the copayment requirement from $1.25 to $2.50, and that since there was no longer an appropriation for the program at the $1.25 level, maintenance of the $1.25 copayment would violate Article X, Section B, paragraph 1 and Article XXV, Section E of the agreement. The Association countered with Article X, Section B, paragraph 7, which dis-

---

[1] The statute that authorized the program contained no copayment provision. *N.J.S.A.* 52:14–17.29(F). At the inception of the program the State negotiated a copayment of $1.25. The $2.50 copayment that is the subject of this litigation has since been increased to $3.50. *L.*1981, *c.* 190, p. 115. For some years prior to the term of the subject agreement, and even before the adoption of the Prescription Drug Program, the State had paid the entire cost of drug prescriptions for Troopers. The subject copayment requirements are applied only to employees' family members. The State has continued to pay the full cost of Troopers' prescriptions.

cussed the Prescription Drug Program specifically. Unlike the provisions for salaries and other fringe benefits such as maintenance allowance, transportation, and clothing allowance, that paragraph contained a statement that "the State shall provide any necessary funds to maintain the program." Therefore, the Association argued, the parties intended to except the Prescription Drug Program alone from the dependence on legislative enactment otherwise expressed in paragraph 1 of that Article.

The provisions in question show the dispute quite clearly.

Article X, Section B, paragraph 1 provides:

Subject to Legislative enactment providing full appropriation of funds for these specific purposes, the State agrees to provide the following benefits [among which is the Prescription Drug Program] during fiscal years 1978–1979 and 1979–1980, effective at the time stated, and payable then or within a reasonable time after enactment of the appropriation.

Article X, Section B, paragraph 7, however, which deals specifically with the Prescription Drug Program, provides:

The State administered Prescription Drug Program shall be continued for the remainder of the Agreement and the State shall provide any necessary funds to maintain the program. Each employee shall be provided with an authorization and identification card, and a brochure describing the details of the Program.

Finally, Article XXV, Section E, provides:

All terms of this Agreement are subject to budgetary and/or legislative limitations or changes.

The arbitrator found that the increase in the copayment requirement was a legislative change. But he believed that the language that "the State shall provide any necessary funds to maintain the program" led to an interpretation that "regardless of legislative enactment, the State will provide either the necessary funds to maintain *a* program or the necessary funds to maintain *the existing* program" (emphasis in original). He found that the last sentence of Article X, Section B, paragraph 7 clearly indicated the latter result. Therefore, the arbitrator concluded that the State had violated its agreement by increasing the copayment. He ordered that the deductible revert to $1.25 and that Troopers' families be reimbursed for any overpayments.

The State refused to comply with the arbitrator's award and commenced proceedings to vacate it. The Association filed a complaint for confirmation of the award. The proceedings were consolidated, and the Chancery Division confirmed the arbitrator's award and dismissed the State's complaint. On the State's appeal, the Appellate Division affirmed. It found no constitutional defect in the arbitrator's ruling since it was not "an attempt to appropriate funds or to compel the Legislature to make a specific appropriation." The court also found that the language in the Appropriation Act of 1979–1980, indicating that the appropriation was "based upon a copayment of $2.50," was not "intended as a mandate that no branch of state government could do otherwise." It concluded that the dispute about construction involved a debatable question.

Judge Fritz dissented and found that the intent of the agreement as expressed in its language was not reasonably debatable. He said:

> Viewed as a whole as it must be, . . . the agreement, I am persuaded, resounds with the intention of the parties that that agreed upon is in any event subject to and conditioned upon the appropriation of funds by legislative enactment . . . [and] that "all terms" of the agreement are within the express condition of being "subject to budgetary and/or legislative limitations or *changes.*" [Emphasis in original].

The State appealed to this Court under *R.* 2:2–1(a)(2).

> [A] subject is negotiable [and arbitrable] between public employers and employees when (1) the item intimately and directly affects the work and welfare of public employees; (2) the subject has not been fully or partially preempted by statute or regulation; and (3) a negotiated agreement would not significantly interfere with the determination of governmental policy. [*In re IFPTE Local 195 v. State,* 88 *N.J.* 393, 404 (1982)].

. The parties agree that the appropriate standards for review of an arbitrator's award in a public sector labor dispute are set forth in *Kearny PBA Local # 21 v. Kearny,* 81 *N.J.* 208 (1979).

> In the context of public employment an arbitrator's determinations in binding arbitration are subject to pertinent statutory criteria as well as the public interest and welfare. In the private sector, the parties may authorize the arbitrator to determine legal issues as he deems fit irrespective of whether those determinations are in accordance with the law. . . . [I]n the public sector the parties do not have this choice, for public policy demands that inherent in the

arbitrator's guidelines are the public interest, welfare and other pertinent statutory criteria. [*Id.* at 217 (footnote omitted)].

Arbitrators in the private sector have broad discretion in determining legal issues, but they may not disregard terms and conditions set forth in the agreement. *In re Arbitration Between Grover and Universal Underwriters Ins. Co.,* 80 *N.J.* 221, 230–31 (1979). In the public sector, in matters of interpretation, the scope of review is limited to determining whether the interpretation of the contractual language is reasonably debatable. *Kearny PBA Local,* 81 *N.J.* at 221. Our task is to determine whether the arbitrator followed the inherent guidelines applicable to public sector arbitration and whether the interpretation of the contractual language is reasonably debatable.

The State first argues that the arbitrator's ruling violates *N.J.Const.* (1947), Art. VIII, § 2, par. 2, which provides that no money shall be drawn from the State Treasury but for appropriations made by law. Had the arbitrator's decision been based solely on the premise that the negotiated agreement was binding on the State Legislature, his ruling would have been plainly contrary to law. The annual Appropriation Act can be the only source of State fiscal commitment since the Legislature has sole power to appropriate funds. *Camden v. Byrne,* 82 *N.J.* 133, 148–49 (1980). But we cannot find on this record conflict with this constitutional provision. There is no suggestion that the $5,100,000 appropriated in the 1979–1980 Appropriation Act for the Prescription Drug Program was insufficient to cover the program at the $1.25 copayment level.

For the same reason, the arbitrator's award is not inconsistent with Article X, Section B, paragraph 1, requiring an available appropriation of funds for the purposes of the agreement. The State simply has not demonstrated that the appropriated funds were insufficient. *Cf. N.J. State P.B.A., Local 29 v. Irvington,* 80 *N.J.* 271 (1979) (municipality must pay interest arbitration award if it has sufficient funds available in its overall budget).

While not conclusive, however, these constitutional and contractual provisions reflect the fiscal reality of negotiations in the public sector. "The constitutional requirement of a unitary appropriation law covering but a single fiscal year reflects a fundamental judgment to centralize and simplify state financial operations." *Camden,* 82 *N.J.* at 146. We have described it as a "constitutional fulcrum." *Id.* at 148. Upon it the State's fiscal year turns.

The State advises us that all State contracts including the one at issue here have always expressly conditioned economic benefits upon legislative action, and points to Article XXV, Section E of the agreement, which provides without reservation: "All terms of this Agreement are subject to budgetary and/or legislative limitations or changes." The only hypothesis that might sustain the award in the face of this provision is that, because the Legislature did not expressly direct that State agencies increase the copayment from $1.25 to $2.50, an agency could, within available funds, elect to provide the Prescription Drug Program to its employees with a copayment of $1.25 or less. In this view, the language in the Appropriation Act would not prohibit this use of agency funds to maintain the integrity of the program.

Even if this had been the arbitrator's theory,[2] we believe that this is too strained an interpretation of the Appropriation Act. The provision for copayment of benefits reflects not merely a monetary policy, but an important governmental policy of shar-

---

[2]Although not required to articulate reasons for his award, *United Steelworkers of America, AFL–CIO v. American Smelting & Refining Co.,* 648 *F.*2d 863, 870 (3d Cir.1981), *cert.* den., 454 *U.S.* 1031, 102 *S.Ct.* 567, 70 *L.Ed.*2d 474 (1981), the arbitrator stated in this case: "I am obliged to hold that the State undertook to provide the necessary funds to maintain the Prescription Drug Program at the level it was when the contract was signed, i.e., $1.25 for dependents and no deduction for troopers themselves." Our duty, however, is to sustain an award if there are legal and factual conclusions to support it. *See Frederick W. Donnelly, Inc. v. Unit One Lawrence Co.,* 171 *N.J.Super.* 30, 33–34 (App.Div.1979), certif. den., 82 *N.J.* 298 (1980).

ing the costs of prescriptions between employer and employee. Although the data is not conclusive, studies of copayment plans demonstrate that increasing joint involvement in the costs of health services can yield overall economies in medical care utilization that exceed the copayment amounts. Ginsburg & Manheim, "Insurance, Copayment, and Health Services Utilization: A Critical Review," 25 *J. Econ. & Bus.* 142 (1973). In the public sector, a shared concern for the costs of a State-funded benefit program is especially appropriate. Thus, this case involves much more than the difference between a $1.25 and a $2.50 copayment. The overall cost reductions may be significantly greater.

The Compensation Program of the agreement contains a number of items in addition to the Prescription Drug Program, including the State-administered dental care program and the State-administered eye care program, each of which has specific copayment provisions. It is difficult to accept the position that the Office of Employee Relations in the Office of the Governor, which negotiates all collective agreements between the State and its bargaining units, would expect to have a hodgepodge of benefits among the various bargaining units. Efficiency in administration alone would argue against such an interpretation.

The arbitrator's single-minded focus on the provision that the State shall provide any necessary funds to maintain this program disregards Article XXV, Section E, which controls all the terms of the agreement. The language in the Appropriation Act was a legislative change, and it is not a reasonably debatable interpretation of the agreement that the change would not affect the contract.

Accordingly, primarily for the reasons stated by Judge Fritz in his dissenting opinion below, we find that the parties intended to make all the terms of the agreement expressly "subject to budgetary and/or legislative limitations or changes." The Legislature changed the copayment to $2.50. We therefore

hold that the arbitrator disregarded an essential condition agreed upon by the parties and that this matter of interpretation is not reasonably debatable. Confirmation of the award should be denied.

The judgment of the Appellate Division is reversed.

SCHREIBER, J., dissenting.

The issue in this case is whether an arbitrator exceeded his delegated powers in his interpretation of certain provisions of a contract between the State of New Jersey and the State Troopers Fraternal Association of New Jersey, Inc. *See N.J.S.A.* 2A:24–8(d) (providing that an award shall be vacated where arbitrator exceeded power). The specific problem presented is whether the State agreed and was obligated to continue the State administered Prescription Drug Program that was in effect on June 30, 1978 (the 1978 Program) throughout the two-year term of the contract, July 1, 1978 to June 30, 1980. Under the 1978 Program as implemented, eligible members of the State Trooper's family had to pay the first $1.25 toward the cost of prescription drugs, the State paying the balance. In 1979 the State unilaterally amended the Program to require payment of the first $2.50. The State Troopers Fraternal Association objected and the matter was subsequently submitted to the arbitrator. The arbitrator held that the State could not validly raise the copayment requirement under the terms of the contract. I believe this interpretation "reasonably debatable" and therefore should be sustained.

The guidelines to be utilized in analyzing the viability of the arbitrator's opinion are settled. They are fully applicable to arbitration in the public sector. When, as here, an arbitrator is charged with interpretation of an agreement, he may not disregard the terms and rewrite the contract. *In re Arbitration Between Grover and Universal Underwriters Ins. Co.,* 80 *N.J.* 221, 230 (1979). Moreover, parties are deemed to have intended that their contract be interpreted in accordance with the law.

*Brooks v. Pennsylvania Mfrs. Ass'n Ins. Co.,* 121 *N.J.Super.* 51, 54–55 (App.Div.1972), modified on other grounds, 62 *N.J.* 583 (1973). However, if an arbitrator's interpretation of the contractual language is reasonably debatable, it must be upheld. *Kearny P.B.A. Local 21 v. Town of Kearny,* 81 *N.J.* 208, 221 (1979).

In all matters, the arbitrator is limited to the authority vested in him by the parties. *Ridgefield Park Educ. Ass'n v. Ridgefield Park Bd. of Educ.,* 78 *N.J.* 144, 155 (1978); *see Barcon Assoc. v. Tri-County Asphalt Corp.,* 86 *N.J.* 179, 209–10 (1981) (Clifford, J., dissenting). However, when public employees are involved, the parties may not agree to authorize the arbitrator to decide legal issues conclusively as he deems fit. Rather, the arbitrator is constrained and bound in his interpretative function by the public interest, the public welfare, and any pertinent statutory criteria. *Kearny P.B.A. Local 21 v. Town of Kearny, supra,* 81 *N.J.* at 217; *see Division 540, Amalgamated Transit Union v. Mercer County Improvement Auth.,* 76 *N.J.* 245, 252 (1978).

The Agreement between the State and the State Troopers was executed on June 30, 1978. The parties undoubtedly intended that State Troopers and members of their families were entitled to the benefits of the 1978 Program. The 1978 Program was expressly included as a term and condition of employment in Article X(B) of the contract. That provision lists nine benefits to which the State Troopers are entitled. The seventh reads as follows:

7. *The* State administered Prescription Drug Program shall be continued for the remainder of the Agreement and the State shall provide any necessary funds to maintain *the* program. Each employee shall be provided with an authorization and identification card, and a *brochure describing the details of the Program.* [Emphasis supplied]

Use of the word "the" throughout the paragraph may be reasonably understood to refer to the State administered Drug Program in effect on June 30, 1978. Indeed, according to the Agreement, each employee had to be provided with a brochure describing the details of that program. The Attorney General

conceded on oral argument that this brochure described the benefits of the Drug Program effective when the contract was made.

The express directive and obligation in Article X(B)(7) was, as the majority states, subject to Article XXV(E), which reads: "All terms of this Agreement are subject to budgetary and/or legislative limitations or changes." The majority recognizes that the current appropriation covering this Program is sufficient to fund the benefits that would be payable on behalf of the State Troopers subject to the Agreement in accordance with the terms of the Program as of 1978. The Attorney General concedes the sufficiency of the amount appropriated for this purpose. Hence it is not asserted that there is any "budgetary limitation" that can serve to alter the Program benefits paid or to satisfy the State's unilateral attempt to reduce these benefits.

However, the majority contends that an explanatory note to the $5,100,000 appropriation funding the State Prescription Drug Program in the Legislature's Annual Appropriations Act is a "legislative change" activating this provision. *See L.*1979, *c.* 119, at 462. I disagree. This is not the type of legislative change envisaged in the contract. Rather, the parties probably contemplated that the contractual undertaking was subject only to a duly enacted legislative modification in the underlying statute creating and authorizing a drug prescription program. The State Health Benefits Commission has been charged with the duty to establish a health benefits program and authorized to purchase contracts to provide drug prescription benefits "as may be required to implement a duly executed collective negotiations agreement . . . ." *N.J.S.A.* 52:14–17.29(F). The Legislature did not modify this act, which is the basic source of authority for drug prescription programs. The Legislature, if it had desired such a modification, would have amended the underlying legislation. *Cf.* Act to Amend the Pharmaceutical Assistance to the Aged, *L.*1978, *c.* 171, § 3 (codified at *N.J.S.A.* 30:4D–22) (increasing statutory copayment requirement from $1.00 to $2.00). Regardless of the purpose and effect in other

contexts, it is certainly reasonably debatable that the note in the Appropriations Act failed to constitute the type of legislative change contemplated by the Troopers' contract.

The majority claims that the State's Office of Employee Relations would not have agreed to a provision that might create differences in the benefits available to the State Troopers and other State employees under the Prescription Drug Program. This argument assumes that there was no give and take between the parties on a multitude of issues that in the judgment of the Office of Employee Relations warranted its singular treatment of the State Troopers. Nothing in the record supports this assumption. Quite to the contrary, as noted, the Division of State Police excluded State Troopers from the copayment obligation for their prescription drugs. I am unaware of a similar practice elsewhere in State government serving to exempt eligible employees from the obligation to contribute to the Program. There simply is no support for the assumption that uniformity requires the result imposed by the majority's decision.

The arbitrator's interpretative conclusion is certainly reasonably supportable.

I would affirm.

Justice HANDLER joins in this opinion.

*For reversal*—Chief Justice WILENTZ and Justices CLIFFORD and O'HERN—3.

*For affirmance*—Justices SCHREIBER and HANDLER—2.