COUNTY COLLEGE OF MORRIS STAFF ASSOCIATION AND VICTOR MULLER, PLAINTIFFS-RESPONDENTS, v. COUNTY COLLEGE OF MORRIS, DEFENDANT-APPELLANT.

Argued March 4, 1985—Decided August 5, 1985.

*Aron M. Schwartz* argued the cause for appellant (*Vogel and Chait,* attorneys; *Arnold M. Chait,* of counsel).

*Mark D. Schorr* argued the cause for respondents (*Sterns, Herbert & Weinroth,* attorneys; *Mark D. Schorr* and *Loraine Schewior,* on the briefs).

The opinion of the Court was delivered by

CLIFFORD, J.

This appeal questions the propriety of an arbitrator's determination in a public sector labor dispute. The public employer discharged the employee because of disciplinary infractions. The arbitrator agreed that the employee had been guilty of misconduct, but he modified the penalty by imposing a suspension in place of termination of employment. The Chancery Division vacated the suspension and reimposed the penalty of

discharge. The Appellate Division, in an unreported opinion, reinstated the arbitrator's award of a suspension. We granted the employer's petition for certification, 99 *N.J.* 146 (1984), and now reverse the judgment of the Appellate Division and reinstate the judgment of the Chancery Division.

I

Defendant County College of Morris (College) employed plaintiff Victor Muller as an automotive maintenance mechanic. College employees are appointed on a yearly basis, and continued employment depends on annual reappointment by the College's Board of Trustees. However, under the employment contract between the College and the County College of Morris Staff Association (Association), once an employee has completed a six-months probationary period, the employee cannot be dismissed except for "just cause" before the expiration of his current employment term.

That is what occurred here: the College discharged Muller before his current employment term had expired. In addition, and consistent with that action, the Board of Trustees refused to reappoint Muller when his employment term finally expired. Plaintiffs have not challenged, in this action, the Trustees' determination on reappointment; rather, they limit their contention to the claim that the College improperly dismissed Muller without having met the "just cause" standard. We note parenthetically that, as we were told at oral argument, the Association has filed a grievance, now alleging that the dismissal clauses of the contact in Article X, referred to below, amount to and were intended to be a tenure provision—that is, that in the absence of "just cause" to discharge, the College is required to renew an employee's contract. We refrain from expressing any view on that issue, which is currently before an arbitrator.

After firing Muller on October 8, 1982, the College set forth in a Memorandum of Record the reasons for dismissal. Those

reasons included the following infractions, which occurred in August and September 1982:

1. falsification of time records (five occasions between 8/26/82 and 9/29/82);
2. insubordination (verbal exchange with superior when confronted with inaccurate time sheet entries);
3. neglect of duty and College property in his care (left tools and equipment unattended after leaving the campus early on 9/24/82);
4. unauthorized use of College property for personal use (drove College vehicle off premises and used College garage to repair fellow employee's car);
5. attempt and threat of personal harm to his supervisor (began to lower a vehicle lift, with vehicle on it, on the supervisor who was standing directly underneath it).

The Association filed a grievance on Muller's behalf. According to Article III of the Contract between the College and the Association the grievance definition "shall govern and limit the scope of contractual, non-contractual and statutory-regulatory grievances." Muller's grievance was a "contractual grievance," defined in Article III as "an alleged misinterpretation, misapplication, or violation of the express terms of this Agreement." Specifically, the contract terms that the College is said to have violated were the discharge provisions of Article X, pertinent parts of which read as follows:

B. After completing six months of employment, the College may dismiss an employee prior to the expiration of such employee's current employment term, for just cause only and such dismissal shall be grievable.

\*        \*        \*        \*        \*        \*        \*        \*

D. The cause for which employees may be discharged shall include, but not be limited to[,] violation of rules, regulations and policies of the College.

After the first three steps of the Article III grievance procedures failed to produce Muller's reinstatement, the parties submitted the matter to binding arbitration. Article III, § C, ¶ 5(c) specifies the contractual limitations on the arbitration proceedings:

(c) The arbitrator's decision shall be in writing and shall set forth his findings of fact, reasoning and conclusions on the issues submitted. *The arbitrator shall be without power or authority to add to, alter, amend or modify the terms of this Agreement* and without authority to make any decision which requires the commission of an act prohibited by law. The arbitrator shall also be bound by the laws of the State of New Jersey and of the United States and

decisions of the Chancellor of Higher Education and the State Board of Higher Education. [Emphasis added.]

Significantly, the contract contained, in addition, a "fully bargained clause," which states:

A. This Agreement represents and incorporates the complete and final understanding and settlement by the parties of all issues for the term of this Agreement. During the term of this Agreement, neither party will be required to negotiate with respect to any such matter, whether or not covered by this Agreement, and whether or not within the knowledge or contemplation of either or both of the parties at the time they negotiated or signed this Agreement.
B. By mutual consent only, the parties may enter into negotiations during the term of this Agreement for the purpose of amending same. This Agreement shall not be modified in whole or in part except by mutual agreement of the parties. Mutually acceptable amendments shall be reduced to writing and submitted for ratification by the Board of Trustees and the Association.

The arbitrator, in an opinion following two days of hearings, described Muller as "a genuine across the board transgressor." The arbitrator found Muller guilty of all of the acts listed in the Memorandum of Record, *supra* at 387, with two exceptions: first, the charge of repairing another's car in the College garage was found to have been unsubstantiated; and second, the arbitrator found that Muller did not actually begin to lower the lift on his supervisor, but rather made only a threatening gesture of releasing the air pressure on the vehicle lift.

Although the arbitrator found Muller guilty of the remaining charged infractions, he nonetheless concluded that the penalty of discharge was inappropriate. In deciding that dismissal was not warranted the arbitrator relied on the College's failure to have criticized, warned, or disciplined Muller before firing him. Moreover, the arbitrator suggested that the College had fatally erred by not dismissing Muller until approximately three weeks after the final and most serious act of misconduct. The critical portion of the arbitrator's opinion reads as follows:

Grievant's total conduct in the normal context of his responsibilities to the Employer, merits discharge for cause.

"Normal[,] however, must include[,] minimally, warnings by employer and a measure of progressive discipline. An employer, including the College, may not stand idly by while an employee accumulates a sufficient number of demerits to

earn his walking papers. While in some CBA's or CNA's, progressive discipline as a prerequisite to industrial capital punishment is spelled out, same is also a standard which is read in by triers of fact/Arbitrators, absent facts and circumstances which can ill afford a warmup prior to discharge. A case in point is the September 16 or 17 contact under the lift, which reflects totally unacceptable conduct by Grievant, rating immediate discharge but nullified herein by College inaction until October 4, 1982, when Grievant was suspended. In the labor-management process, the employer may not quietly warehouse violations and then act, without prior warning. The inaction of the employer while the worker operates by rules contrary to standards, projects a sense of tacit approval, a license to do as one pleases without regard to job responsibility. In that sense, the employer contributed to ongoing breach by the worker, projecting false security to the latter.

Thus in the instant proceeding the Grievant moved from one transgression to another, without fear or concern. The Management silence became an invitation to the next act of disregard for the worker obligation to the employer. While not meriting discharge on the succession of facts herein, Grievant must be penalized and also warned thereby, that his job is on the line.

Accordingly, the arbitrator reduced the penalty of discharge to an eight-months suspension without pay.

Thereafter, the Association sought to have the arbitration award confirmed in the Chancery Division pursuant to *N.J.S.A.* 2A:24-7, and the College applied to have the award vacated on the ground that the arbitrator had exceeded his powers by adding terms to the employment contract of the parties. *See N.J.S.A.* 2A:24-8(d). The court determined that the arbitrator had exceeded his authority by reading into the collective bargaining agreement provisions for progressive discipline and immediate discharge. The court noted that the arbitrator had found Muller guilty of rule infractions meriting discharge for cause. Having made such a finding, the arbitrator could not alter the parties' agreement by imposing on the College requirements that had never been agreed upon by the parties and were not a part of the employment contract. Accordingly, the court ruled that the arbitrator had erred in reducing the penalty from discharge to suspension.

The Appellate Division disagreed with the trial court's conclusion that the arbitrator had written additional provisions into the parties' contract. According to the Appellate Division, the arbitrator, in attempting to determine whether "just cause" for

discharge existed, simply reviewed the entire employment rela-
tionship and balanced the degree of fault of the employee
against the degree of fault of the employer. Therefore, while
Muller's conduct would warrant discharge under other circum-
stances, discharge was not required here because the College
had invited acts of misconduct by having failed on previous
occasions to impose discipline. Thus, in the Appellate Division's
view of the case, the arbitrator had permissibly concluded that
the penalty of discharge was not justified in the context of this
employment relationship.

Having carefully reviewed the collectively-negotiated con-
tract of these parties and the factual findings made by the
arbitrator, we conclude that the Appellate Division erred. Spe-
cifically, the arbitrator could not rely on the lack of progressive
discipline or on the delay in discharging Muller as bases for
reducing the disciplinary penalty.

## II

Some first principles bear repeating at this point. We
are reminded of the desirability of settling labor-management
disputes through arbitration, a device that is viewed favorably
by our courts. *Barcon Assocs. v. Tri-County Asphalt Corp.*,
86 *N.J.* 179, 186 (1981). It is designed to provide a speedy and
economic resolution of disputes, *Carpenter v. Bloomer*, 54
*N.J.Super.* 157, 168 (App.Div.1959); and to the extent possible,
arbitration should spell the conclusion to litigation rather than
the beginning of it. *In re Arbitration Between Grover and
Universal Underwriters Ins. Co.*, 80 *N.J.* 221, 235 (1979) (Pash-
man, J., dissenting); *Collingswood Hosiery Mills, Inc. v.
American Fed'n of Hosiery Workers*, 31 *N.J.Super.* 466, 473
(App.Div.1954).

Towards that end, judicial interference with the role of the
arbitrator is to be strictly limited. An arbitrator's award is not
to be cast aside lightly. *Kearny PBA Local # 21 v. Kearny*, 81
*N.J.* 208, 221 (1979). In the public sector, the scope of review in

matters of interpretation is confined to determining whether the interpretation of the contractual language is reasonably debatable. *State v. State Troopers Fraternal Ass'n*, 91 *N.J.* 464, 469 (1982).

There are, however, limitations to the deference given an arbitrator's decision. An arbitrator's award is subject to being vacated when it has been shown that a statutory basis justifies such an action. *Kearny PBA, supra*, 81 *N.J.* at 221. The applicable statute, *N.J.S.A.* 2A:24–8, provides that:

The court shall vacate the award [of an arbitrator] in any of the following cases:

\*        \*        \*        \*        \*        \*        \*        \*

d. Where the arbitrators exceeded or so imperfectly executed their powers that a mutual, final and definite award upon the subject matter submitted was not made.

When parties have agreed, through a contract, on a defined set of rules that are to govern the arbitration process, an arbitrator exceeds his powers when he ignores the limited authority that the contract confers. The scope of an arbitrator's authority depends on the terms of the contract between the parties. *Communications Workers v. Monmouth County Bd. of Social Servs.*, 96 *N.J.* 442, 448 (1984); *Barcon Assocs. v. Tri-County Asphalt Corp., supra*, 86 *N.J.* 179, 209–10 (dissenting opinion); *Goerke Kirch Co. v. Goerke Kirch Holding Co.*, 118 *N.J.Eq.* 1, 4 (E. & A. 1935); *William J. Burns Int'l Detective Agency, Inc. v. New Jersey Guards Union, Inc.*, 64 *N.J.Super.* 301, 307 (App.Div.1960), certif. denied, 34 *N.J.* 464 (1961). Both the jurisdiction and the authority of the arbitrator are circumscribed by the powers delegated to him by the contract of the parties. *Communications Workers, supra*, 96 *N.J.* at 448; *see Kearny PBA Local # 21 v. Town of Kearny, supra*, 81 *N.J.* at 217. Thus, an arbitrator may not disregard the terms of the parties' agreement, *State v. State Troopers Fraternal Ass'n, supra*, 91 *N.J.* at 469, nor may he rewrite the contract for the parties. *In re Arbitration Between Grover*

*and Universal Underwriters Ins. Co., supra,* 80 *N.J.* at 230–
31. The concept has been stated succinctly by the Appellate
Division: "where an arbitration award does not draw its es-
sence from the bargaining agreement, it will not be enforced by
the courts." *Belardinelli v. Werner Continental Inc.,* 128
*N.J.Super.* 1, 7 (App.Div.1974) (applying federal substantive
law, The Labor Management Relations Act of 1947, 29 *U.S.C.*
§ 185).

### III

▮ With the foregoing rules as our guide we turn to the
contentions of the parties. Plaintiffs assert that the College
got exactly what it had bargained for—an arbitrator's review of
"just cause." They would have us read the arbitrator's opinion
as stating that after reviewing the entire context of this em-
ployer-employee relationship, the arbitrator found as fact that
there was no "just cause" for discharge. But the record fails
to support that argument.

Rather, it is clear that the arbitrator found that Muller's
conduct was sufficiently improper as to merit discharge for
cause—that is, the arbitrator determined specifically and unmis-
takably that there was "just cause" for dismissal. To arrive at
such a finding, the arbitrator undoubtedly resorted to his
knowledge as to the types of misconduct that occur on the job
and as to the level of infraction that is sufficient to warrant
dismissal. The arbitrator brought to this arbitration proceed-
ing his experience in making just these kinds of determinations.
It was for this very purpose that these parties enlisted the
assistance of an arbitrator.

Once the arbitrator had applied his special expertise and
found the plaintiff guilty of misconduct sufficient to warrant
discharge, then the limits on his power required that the
employee be dismissed. *See Mistletoe Express Serv. v. Motor
Expressmen's Union,* 566 *F.*2d 692 (10th Cir.1977); *Amanda
Bent Bolt Co. v. International Union,* 451 *F.*2d 1277 (6th
Cir.1971); *Litvak Packing Co. v. Amalgamated Butcher*

*Workmen,* 455 *F.Supp.* 1180 (D.Colo.1978); *Belardinelli v. Werner Continental, Inc., supra,* 128 *N.J.Super.* 1. But to avoid that result, the arbitrator admittedly read into the agreement a condition not required by the contract: the necessity for incremental or progressive discipline. That this is so is plain from the arbitrator's insistence that the "normal context of [grievant's] responsibilities * * * must include * * * a measure of progressive discipline." *Supra* at 388. Without imposing that requirement the arbitrator could not have avoided discharging Muller—at least could not have avoided that result without sacrificing all consistency in his written opinion.

However, the arbitrator's "reading in" ignored the contractual provision that prohibited him from adding to, altering, or modifying the parties' agreement. It overlooked the fact that the collective bargaining agreement was considered to be the complete understanding of the parties, and it disregarded the directive that any modification in responsibilities be agreed upon in writing. Moreover, by definition, plaintiffs' contractual grievance was confined to a misinterpretation of the express terms of the contract. The only contractual provisions at issue were the "just cause for dismissal" terms of Article X, *supra* at 387. The arbitrator having found sufficient violations of College rules to warrant discharge, there existed no other contract terms that would permit reduction of the penalty of discharge to one of suspension. We repeat that the arbitrator's authority is circumscribed by whatever provisions and conditions the parties have mutually agreed upon. *Grover, supra,* 80 *N.J.* at 229. Any action taken beyond that authority is impeachable. *Id.*

It is of no moment that the parties' contract did not provide specifically for discipline short of discharge. The arbitrator was not forced to make the difficult choice between dismissing the employee or imposing no discipline at all, for a series of options was still available. Had the facts supported such a conclusion, the arbitrator could, of course, have found that

Muller was not guilty of the offenses with which he was charged in the Memorandum of Record, *supra* at 387. Even after finding the employee guilty of the specified charges of misconduct, the arbitrator was free to apply his special expertise and determine that these offenses do not rise to a level of misconduct that constitutes just cause for discharge. Had the arbitrator so concluded, we assume that the proper remedy would have been a disciplinary penalty less severe than that of discharge.

We pause to note that it appears from the way the arbitrator framed the issues that he was aware that the option of imposing some lesser penalty was available under appropriate circumstances. The arbitrator's opinion listed the issues as follows:

Is Victor Muller guilty as charged in the Memorandum of Record, dated October 15, 1982? If so, is the penalty of discharge imposed on October 8, 1982, appropriate? If not, what penalty, if any, is appropriate?

We note as an aside that the questions listed should not be regarded as a submission of the parties that memorialized the issues and finalized the precise terms of the dispute. *See Grover, supra,* 80 *N.J.* at 230. Rather, this formulation of the issues was the arbitrator's own attempt at a rough explanation of what was at stake in the arbitration hearing. The parties have not suggested in their briefs or at oral argument that this framing of the issues constitutes a submission that precisely defines the parties' controversy. In light of the absence of any apparent concern of the parties in respect of the arbitrator's framing of the issues, we do not make that formulation a focal point of our analysis.

The point to be made here, however, is that the arbitrator found the employee guilty of substantially all of the charged infractions and determined that the misconduct merited discharge for cause. Given these conclusions, the Court and the arbitrator are compelled by the constraints of the contract to discharge the employee.

We reject plaintiffs' contention that under the circumstances of this case there can be no "just cause" for discharge without

some prior warning to the employee. Obviously, there is no explicit provision in the contract between the College and the Association requiring the use of such incremental or progressive discipline, nor did the arbitrator point to any other, related contract terms as furnishing implicit support for a progressive-discipline requirement. We are impressed with the fact that it has been the practice in other labor contracts to set forth specifically any requirements of prior warning and progressive discipline. *See, e.g., Grand Rapids Die Casting Corp. v. Local Union No. 159,* 684 *F.*2d 413, 414 (6th Cir.1982); *Mistletoe Express Serv. v. Motor Expressmen's Union, supra,* 566 *F.* 2d at 695; *Super Tire Eng'g Co. v. Teamsters Local Union No. 676,* 546 *F.Supp.* 547, 549 n. 2 (D.N.J.1982), rev'd, 721 *F.*2d 121 (3d Cir.1983); *Belardinelli v. Werner Continental Inc., supra,* 128 *N.J.Super.* at 6–7. The inclusion of these explicit provisions in other agreements suggests to us that the decision whether to use such a disciplinary scheme is likely to be a subject of collective negotiations, and that the College would legitimately expect the Association to give some *quid pro quo* to obtain that protection.

Moreover, examples of such contracts illustrate that progressive discipline can be exercised in a variety of ways. For instance, parties may agree that while certain acts of insubordination warrant the imposition of graduated disciplinary measures, other acts of misconduct will lead to immediate dismissal. *See Mistletoe Express, supra,* 566 *F.*2d at 695; *Super Tire, supra,* 546 *F.Supp.* at 549 n. 2; *Belardinelli, supra,* 128 *N.J.Super.* at 6. Thus, the mere declaration by an arbitrator that progressive discipline is an approved device that ought to be used does not dispose of the controversy. Instead, it opens up an entirely new line of inquiry: to what extent and under what circumstances and, particularly, in respect of what kinds of misconduct should progressive discipline be imposed? Typically, it is left to the parties to specify in the contract the answers to these questions, if progressive discipline is to be resorted to at all.

In this case, however, the arbitrator did not rely on the terms of the contract as support for requiring incremental discipline prior to discharge. Instead, as he acknowledged, he "read into" the agreement the necessity for progressive discipline. Yet neither the arbitrator nor plaintiffs furnish any authority for the proposition that triers of fact or arbitrators typically do such "reading in." Nor is there any demonstration that similar employers have adopted a progressive discipline scheme, as evidence of custom or standard usage in the workplace. In lieu of such proofs, plaintiffs argue that the arbitrator may require progressive discipline because he is entitled to balance the equities in order to arrive at a fair and just result.

In support of this general proposition, plaintiffs rely on *William J. Burns Int'l Detective Agency, Inc. v. New Jersey Guards Union, Inc., supra,* 64 *N.J.Super.* 301. In *Burns,* as in the instant matter, an employer sought to discharge an employee for five separate infractions of company rules. The employee was a guard. All five offenses occurred on one night. The infractions with which the employee was charged were failure to make a routine check on various locations, failure to complete his log, parking his automobile on the premises, falling asleep on the job, and being under the influence of intoxicating liquor during working hours. The arbitrator found the employee guilty of all the offenses. Nevertheless, the arbitrator chose not to discharge the employee, ruling instead that in light of the employee's satisfactory prior record, he had earned the right to be excused for "one bad night" and was entitled to back wages. *Id.* at 306. The Appellate Division agreed with the arbitrator's result, although not with his reasoning.

Plaintiffs point to the court's statement in *Burns* that the arbitrator "was attempting to balance the equities involved in order to arrive at a fair result, and this is what the parties bargained for in their agreement to arbitrate," 64 *N.J.Super.* at 312; but their reliance on *Burns* is misplaced. Initially we note that there were apparently no contractual limits on the *Burns*

arbitrator, so that he had more freedom to fashion his own remedy. More importantly, in *Burns*, the issue of "just cause" was not before the court, inasmuch as the employer did not challenge the order reinstating the employee. Instead the employer was seeking only to cancel the portion of the award that granted back pay to the employee. In fact, after noting that the case focused solely on the question of the arbitrator's authority to award back wages, the *Burns* court stated, "we certainly imply no approval of the arbitrator's expression that Zwald [employee] was entitled to 'one bad night', in light of the nature of the employer's business and the essentiality of the employee's vigilance in the performance of the duties to which he was assigned." 64 *N.J.Super.* at 306.

We emphasize that our conclusion that it was improper for the arbitrator in this case to have added a requirement of progressive discipline to the parties' contract carries with it no implication that an arbitrator is powerless to balance equities. Nor do we suggest that the actions of an employer are irrelevant to an arbitrator's determination of "just cause." We acknowledge, for example, the rule that the employer has a duty to abide by principles of procedural fairness when imposing discipline, and in disciplinary matters management is required to judge all employees by the same standards. Here we simply recognize that an arbitrator's power to decide what is fair and just is at all times limited by the intent of the parties as manifested by the terms of their contract. The parties took pains to put explicit restrictions on the arbitrator's authority. The arbitrator measured the employee's conduct against the standard of "just cause" for dismissal and found "just cause" to exist. Despite the fact that the contract called for no more, the arbitrator went a significant step further by requiring the College to engage in progressive discipline of its employee as a prerequisite to discharge. In so doing, the arbitrator exceeded his authority by adding a new term to the contract. *See In re Riverbay Corp.*, 91 *A.D.*2d 509, 456 *N.Y.S.*2d 378 (1982). *But see Commissioner of Middlesex County v. American Federa-*

*tion of State, County and Mun. Employees,* 372 *Mass.* 466, 362 *N.E.*2d 523 (1977).

As a final point, we reject the arbitrator's suggestion, urged by plaintiffs, that by waiting approximately three weeks before imposing discipline the College somehow lost its power to discharge Muller. The hypothetical "perhaps"-es posed by the dissent, *post* at 405, lose sight of the reality of the dissenters' position: if the employer delays discharge of the employee in order to investigate the facts, the employer loses the right to discharge the wrongdoer, whereas if the employer discharges the employee on the spot, the employer runs the risk of having acted on insufficient information and thereby exposes himself to a potentially sizeable back-pay award at a later date for wrongful discharge.

Although basic concepts of fairness suggest that the employer must exercise its right to discipline within some reasonable period, we conclude that the College met that requirement in this situation. There has been no showing of prejudice or unfairness to plaintiff traceable to the delay in discipline. The College simply needed some time to investigate the alleged attempted infliction of bodily harm, see Memorandum of Record, *supra* at 386–87, and to allow the employee to respond to the charges. We view this as a fair and judicious course of action for which the College should not be penalized.

In order for the process of arbitration to merit the confidence of parties to labor disputes, arbitrators must at all times adhere to the rules that have been agreed upon by the parties as set forth in their contract. We conclude that in this case the instant arbitrator's award exceeded the parties' grant of authority. Although an arbitrator is empowered to use much of his own knowledge and experience to resolve a dispute, his guide is at all times the agreement of the parties. To that contract he must be faithful. Because the award before us fails to draw its essence from the parties' collectively negotiated agreement, the judgment of the Appellate Division approv-

ing that award must be reversed and the judgment of the Chancery Division reinstated.

WILENTZ, C.J., dissenting.

The majority is obviously convinced that this employee should have been fired. What the majority has forgotten is that when the employer and the employees' association agreed upon arbitration of the wrongful discharge issue, it was the arbitrator's conclusion that became important, and the Court's conviction irrelevant.

The majority finds that the arbitrator decided that there was "just cause" for discharge and that the issue, therefore, is whether the arbitrator, having *found* "just cause," has the power, despite that finding, to deprive the employer of its consequent clear right to discharge the employee. One would think the Court would hesitate to attribute to a presumably experienced, intelligent, and impartial arbitrator, such a ludicrous decision, namely, that even though he found the employer had "just cause" to discharge plaintiff, and even though the contract explicitly allowed discharge under such circumstances, the employer nevertheless could not discharge this employee.

That is not, however, what the arbitrator found. A fair, common sense, reading of his opinion is that he found that *ordinarily* ("normally") this employee's conduct would constitute "just cause" for discharge, but given the particular circumstances surrounding that conduct, including the employer's accompanying acts, "just cause" did not exist. Those circumstances included the projection by the employer of "a sense of tacit approval" of the employee's conduct, the employer's failure to make clear, either by explicit prior warning (with or without some prior discipline short of discharge) that repetition of that or similar conduct would result in his discharge, and the employer's failure to act within what the arbitrator thought was a reasonable period. It was the combination, the aggregate, of all these circumstances, that led to the arbitrator's

decision that discharge was *not* warranted, *i.e.*, that "just cause" did *not* exist.

Noting that the arbitrator has said that "grievant's total conduct ... merits discharge for cause," the Court disregards the intervening clause ("grievant's total conduct *in the normal context of his responsibilities to the Employer* merits discharge for cause") and its obvious meaning—made clear beyond doubt by the succeeding paragraphs of the arbitrator's opinion. The arbitrator is saying that if what happened here was in the "*normal context*" of plaintiff's work, there would be just cause for discharge; but since it was *not* normal (no prior warnings, no prior lesser discipline, instead employer inaction conveying to the employee a sense of tacit approval) there was *no* just cause, *i.e.*, the "succession of facts" did "not merit[ ] discharge." (Paraphrase of end of portion of arbitrator's opinion quoted *ante* at 388.) This interpretation by the Court drains the arbitrator's opinion of its true meaning, and, having thus drained it, the Court can go on to conclude that the arbitrator's award does not "draw its essence from the parties' agreement."

In dealing with progressive discipline, the Court notes that the Agreement does not explicitly provide any requirement of progressive discipline and concludes that, since the Agreement does not allow the arbitrator to add to, alter, etc., the Agreement, the arbitrator was without power to impose a "progressive discipline" requirement. Included among the Court's premises, indeed its major premise, is that an arbitrator may not consider progressive discipline unless the agreement explicitly provides for it, absent some custom in the industry or practice by the particular employer. We have found no case anywhere with a holding that prohibits an arbitrator, in determining whether "just cause" exists, from considering whether there was prior warning or, what amounts to the same thing, prior or lesser discipline ("progressive discipline").

The Court reaches this *legal conclusion* on the basis of cases that do *not* so hold, the cases being used by the Court not for

their holdings but rather for the example they provide of collective bargaining agreements that *did* explicitly deal with "progressive discipline." In other words the Court uses *its* experience (limited apparently to the four cases cited *ante* at 395) as the basis for its legal conclusion that the omission of any mention of progressive discipline in a collective bargaining agreement prevents the arbitrator from considering it, since the practice, according to the Court, in connection with collective bargaining agreements is to include progressive discipline in the agreement whenever the parties intend it to be considered by the arbitrator. That, I submit, is a somewhat lean experience to warrant the Court's conclusion, with some confidence, *as a matter of law,* that if progressive discipline is not explicitly mentioned, the arbitrator cannot consider it. Actually there is no evidence whatsoever in this record that would justify the Court in coming to *any* conclusion about the significance of the fact that it is not mentioned in a collective bargaining agreement, except the evidence found in the arbitrator's opinion that a requirement of prior warning, including "progressive discipline," is regularly regarded by arbitrators as implicit in "just cause" disputes. That evidence is not only nowhere contradicted but, given the presumed experience of the arbitrator, it is persuasive.

The arbitrator's opinion is based on the premise that the presence or absence of prior warnings may determine whether an employee's otherwise wrongful conduct constitutes just cause for discharge. As the arbitrator said in his opinion:

> An employer, including the College, may not stand idly by while an employee accumulates a sufficient number of demerits to earn his walking papers .... In the labor-management process, the employer may not quietly warehouse violations and then act, without prior warning. The inaction of the employer while the worker operates by rules contrary to standards, projects a sense of tacit approval, a license to do as one pleases without regard to job responsibility. In that sense, the employer contributes to ongoing breach by the worker, projecting false security to the latter.
>
> Thus in the instant proceeding the Grievant moved from one transgression to another, without fear or concern. The Management silence became an invitation to the next act of disregard for the worker obligation to the employer.

The only context in this case in which any question can be raised about the arbitrator's right to consider "progressive discipline" is in connection with the arbitrator's "just cause" determination: in determining "just cause" may the arbitrator consider whether the employer made it clear to the employee that if certain conduct (or similar conduct) were repeated, he would be fired? It was in that context, namely, in deciding whether or not there was just cause, that the arbitrator considered these matters.

The first point that should be noted in this connection is that the arbitrator did *not* rule that before this employer fires anyone, he must impose prior lesser discipline ("progressive discipline") for the same or similar misconduct. All the arbitrator noted was the obvious unfairness—*un*just cause—of allowing an employee continually to engage in wrongful conduct without ever warning him of the consequences, and then, upon a particular repetition, firing him—committing "industrial capital punishment"—when the employee had no reason to believe this would happen. It takes no great analytic power to perceive that the concept of "just cause" *necessarily* includes—unless the parties expressly exclude it—the question of the employee's prior knowledge of what is expected of him, which, in turn, will most often involve questions of whether he was told ("warned") and sometimes more strongly "told" ("disciplined") that a certain kind of behavior, if engaged in or repeated, would lead to discharge.

An act that, by itself, may not constitute "just cause" for discharge (failing to return a hammer to the tool rack, leaving it instead on the workbench) will, if repeated after clear warning that repetition will lead to discharge, become "just cause," or, if innocuous enough, may require prior lesser discipline ("progressive discipline") before its repetition constitutes "just cause." There are other actions—stealing the employer's property—that are so obviously threatening, not only to the employer but to the entire workforce, as to constitute "just cause" without any prior warning. The extent of prior similar acts,

without warning or discipline by the employer; the tacit approval of such conduct by the employer; the employer's general dealings with the employee, and with all employees; the kind of employment, the number of years of service—these and innumerable other factors, including, not in the least, the impact of discharge or lesser discipline on labor relations—all of these play a legitimate and important part in the arbitrator's "just cause" determination. It cannot be seriously contended that a collective bargaining agreement must *explicitly* allow for their consideration in order for the arbitrator to weigh them in determining just cause.

What the arbitrator noted here was that there was nothing—neither prior warning nor prior lesser discipline—that would let this employee know that his job was in jeopardy. The arbitrator did *not* say that prior lesser discipline ("progressive discipline") was required (either here or in any other instance) but rather that "just cause" here, as in all work places, requires that the employee have good reason to believe that a certain kind of behavior will jeopardize his employment.

There is no question but that, unless explicitly excluded, an arbitrator having the power to determine whether a discharge is warranted by "just cause" has the further power, where he finds there is no just cause, to impose lesser discipline. The majority apparently agrees. *Ante* at 394. With the express power given here to decide "just cause" without any limitation, and the implied power to impose any lesser discipline where he finds the misconduct does not constitute "just cause," the arbitrator must have the implied power to consider any and all circumstances that he deems relevant to the questions of "just cause" and appropriate discipline, in order that he may wisely exercise this broad power to select one of many permissible dispositions. By implicitly empowering the arbitrator to impose lesser discipline, the parties have in effect allowed him to impose a requirement of "progressive discipline" on an *ad hoc* basis before discharge will be permissible. That is precisely

what the arbitrator does when he finds there is no just cause for discharge, but that there is cause for lesser discipline.

Both the Court and the employer stress the lift incident, and strongly challenge the arbitrator's conclusion that "just cause" might have existed at that moment, but that by the time the employer acted it would no longer be just to discharge this employee. Even there, however, the Court's acceptance of that argument fails to accord to the arbitrator the power given to him by the parties to decide "just cause." The facts and circumstances surrounding misconduct, relevant to whether "just cause" existed at a particular time, may include not only acts prior thereto but acts thereafter. The man who fails to return the hammer to the rack after repeated warnings and even after prior lesser discipline may be found to be rightfully discharged immediately upon the most recent transgression, but wrongfully if the discharge is attempted one year later.

The chronology of events, each followed by the employer's silence, puts the matter in proper perspective: the kind of misconduct brought before the arbitrator had apparently been going on "for a number of years, leaving at will with never a word of disapproval" from management, the specific misconduct here being that on August 26 he falsified time records—no warning, no discipline; September 14, falsified time records and was insubordinate concerning such records—no warning, no discipline; the same day, September 14, used College property for personal purposes without authorization—no warning, no discipline; September 16, threatened to lower lift on supervisor—no warning, no discipline; September 17, falsified time records—no warning, no discipline; September 24, falsified time records—no warning, no discipline; the same day (September 24) left College equipment (welding equipment and tools) unattended after leaving early—no warning, no discipline; September 29, falsified time records—no warning, no discipline; October 8, discharged.

While the accuracy of the explanation for the delay in discharging plaintiff after the lift incident is questionable (it is not mentioned in the arbitrator's opinion and, since there is no transcript of the proceedings before the arbitrator, its accuracy requires more documentation than the assertion of counsel), the important point is that the significance of the delay, including its explanation, is a matter for the arbitrator to determine, not counsel or this Court. Given the combination of circumstances, including, without doubt, the employer's tacit approval, which encouraged the plaintiff to move from one transgression to the next, the incident under the lift took on a different color, and the arbitrator decided that while it was the most serious, it was just one of many instances of wrongdoing as to which there had been no prior warning and all of which did not add up to "just cause."

As noted above, whether "just cause" exists at a given moment may depend not only on what went before but also on what went after that moment. Delaying an employer's response to employee misconduct may be deemed unfair not only by the affected employee but by the entire workforce. They may find it unfair for the employer, who might otherwise have just cause to fire the employee, to wait around, perhaps making up its mind, perhaps wanting to have some leverage over the employee, perhaps waiting for other causes to bolster its case, for inordinate periods of time before acting; the idea of "waiver" is not limited to lawyers and judges; the workforce may regard it as cruel to allow a worker to continue on the job believing that for some reason the employer has decided not to exercise the right of discharge that may have existed and then, out of the blue, "lower the boom." The factor of delay can be especially significant when there has never been a prior warning that discharge may result.

So while the majority may think the delay here was reasonable (even though there is no basis in the record before us to think so), it was well within the arbitrator's power to conclude otherwise in the context of all of the facts and circumstances

before him. The arbitrator's responsibility to consider all such facts and circumstances is consistent with his critical role in fostering stability in labor-management relations. The arbitrator's role is an integral component of the collective bargaining process. The wisdom of according deference to the arbitrator's exercise of discretion in a grievance proceeding is widely recognized:

> The labor arbitrator's source of law is not confined to the express provisions of the contract, as the industrial common law—the practices of the industry and the shop—is equally a part of the collective bargaining agreement although not expressed in it. The labor arbitrator is usually chosen because of the parties' confidence in his knowledge of the common law of the shop and their trust in [his] personal judgment to bring to bear considerations which are not expressed in the contract as criteria for judgment. The parties expect that his judgment of a particular grievance will reflect not only what the contract says but, insofar as the collective bargaining agreement permits, such factors as the effect upon productivity of a particular result, its consequence to the morale of the shop, his judgment whether tensions will be heightened or diminished. For the parties' objective in using the arbitration process is primarily to further their common goal of uninterrupted production under the agreement, to make the agreement serve their specialized needs. The ablest judge cannot be expected to bring the same experience and competence to bear upon the determination of a grievance, because he cannot be similarly informed. [*United ed Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 *U.S.* 574, 581–82, 80 *S.Ct.* 1347, 1352–53, 4 *L.Ed.*2d 1409, 1417 (1960).]

*See* Cox, "Reflections Upon Labor Arbitration," 72 *Harv.L.Rev.* 1482, 1493–95 (1959); Shulman, "Reason, Contract, and Law in Labor Relations," 68 *Harv.L.Rev.* 999, 1004–05 (1955).

The dispute almost universally committed to arbitration in collective bargaining agreements is whether the employer had just cause to discharge an employee. No issue is more important to the parties. What the parties want is swift and fair disposition of that dispute by those with sound knowledge of the workplace and labor relations. Their ultimate goal is to assure that such disputes will do as little damage to their relations as possible; indeed their hope is that the arbitrator's resolution may even improve labor relations at the workplace. The Court has forgotten these fundamental objectives today; it has also forgotten the rule that requires us to give great deference to arbitration, a deference that necessarily includes a

sympathetic rather than a hostile reading of the arbitrator's opinion. Today's decision is an unfortunate exception to this Court's recognition of the desirability of arbitration in labor relations and of the superior wisdom and experience of arbitrators in determining disputes in that field.

*For reversal*—Justices CLIFFORD, HANDLER, POLLOCK, O'HERN and GARIBALDI—5.

*For Affirmance*—Chief Justice WILENTZ and Justice STEIN—2.