644 A.2d 1140

NEW JERSEY HIGHWAY AUTHORITY, PLAINTIFF–APPELLANT, v. INTERNATIONAL FEDERATION OF PROFESSIONAL AND TECHNICAL ENGINEERS, LOCAL 193, AND GERARD ADAMCZYK, DEFENDANTS-RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued June 13, 1994—Decided July 11, 1994.

600

Before Judges PETRELLA, BAIME, and CONLEY.

*Stephen J. Edelstein* argued the cause for appellant (*Schwartz, Simon, Edelstein, Celso & Kessler,* attorneys; *Mr. Edelstein,* of counsel; *Leonard C. Schiro and Wendi F. Weill,* on the brief).

*Sanford R. Oxfeld* argued the cause for respondents (*Balk, Oxfeld, Mandell & Cohen,* attorneys; *Mr. Oxfeld,* of counsel; *Randi Doner,* on the brief).

The opinion of the court was delivered by

PETRELLA, P.J.A.D.

New Jersey Highway Authority (NJHA) appeals from a Law Division order, which confirmed an arbitration award in favor of defendants-respondents International Federation of Professional and Technical Engineers, Local 193 (Local 193), and Gerard Adamczyk (collectively referred to as "defendants").

This matter stems from a November 23, 1992 arbitration award that required NJHA to reimburse Adamczyk for accrued sick and vacation days, totaling about $17,000, even though he had been terminated for stealing toll receipts. The facts are essentially undisputed. NJHA operates and maintains the Garden State Parkway. Local 193 represents toll supervisors (those empowered to supervise toll plazas). The parties entered into a public sector collective negotiation agreement.

Adamczyk, a Local 193 union member, was a supervisor at the Cape May Toll Plaza. His duties included the securing of monies collected from automatic toll machines and placing those funds in a vault located at the toll plaza. In March 1992, the Internal Audit Division for NJHA informed security at the plaza of shortages totaling approximately $541. An investigation ensued.

On April 3, 1992, security agents witnessed Adamczyk take a bag of coins and tokens from the vault building and place it in his

automobile.[1] Security then notified the New Jersey State Police, which sent two police officers to the scene of the crime.

Upon arrival, an officer approached Adamczyk and identified himself, whereupon Adamczyk said that "he had made a mistake and ... [the police officer] could go in his vehicle to obtain the coins he had taken[,]" according to the officer's police report. After reading Adamczyk his Miranda rights and preparing a consent to search form that he signed, the police recovered the plastic bag, which contained about $111 in coins and tokens, from the vehicle.[2] The police then arrested him, took him to the police station, and charged him with theft.

In response to an officer asking him to explain what he knew regarding the theft, Adamczyk stated: "Plain English, I took the money." He specifically said:

> When I was changing the vaults [containers used to transfer tokens and coins] I found a vault from lane four have an un-secure lid. When I was placing the same vault on the pallet in the vault building some money fell out. I opened the lid, took a few handfuls out and put the coins in a plastic bag. I proceeded to put the seals on the rest of the vaults, started to take the damaged vault into the building to count it as per proper procedure. Changed my mind threw it back in the stack on the pallet put the safety lid or security lid on it then put the seal on it. Went to the car took off the glove I wear on my left hand and put the bag of money under the front seat of the car.

Adamczyk hastened to add: "But I never pried this or any other vault open."

---

[1] According to the police report, security agents at the toll plaza observed Adamczyk from the woods behind the vault building using binoculars.

[2] Although not included within the "total value stolen" figure listed in the police report, the report also indicates that the officers seized $2 worth of nickels and $105 worth of tokens. Moreover, according to the police report, a subsequent search of Adamczyk's locker revealed (1) a coffee can with approximately 2,379 pennies, 1 nickel, and 2 dimes; (2) a plastic bag with 12 parkway bus tokens; (3) another plastic bag with 68 parkway tokens; and (4) a jar with 291 pennies and 1 dime inside it. The police report additionally indicated that Adamczyk had been working on most of the days the Internal Audit Division of NJHA noticed vault shortages.

Adamczyk also admitted to incidents of thievery when he provided the following responses to questions asked by the State police:

Q. Have you ever taken any money before, money that you should have turned in?

A. Yes.

Q. Would you tell me when and how you did that?

A. I can't tell you when an[ ] how, occasionally out of a vault that wasn't locked. Occasionally I found a vault that wasn't locked, I reached in and took a handful of change out. I put it in my pocket.

Q. About how many times did you do this?

A. I can't give you an exact number, maybe a dozen over a couple of years.

Q. Approximately how much money was involved when you did this?

A. I don't know, I didn't count it Rick.

Q. Do you remember when you did this?

A. One day last week. Before that it had to be approximately a month.

Q. Have you ever taken any money from the toll lanes and not turned it in when you should have, money that was lying on the ground?

A. Yeah a couple of coins once in a while.

NJHA immediately suspended Adamczyk and, on April 10, 1992, formally charged him "with improper performance of duty and failure to perform as required in [his] job description." [3] NJHA charged Adamczyk with unlawfully removing about $111 on April 3 and unlawfully removing "varying amounts of coins and tokens from property of the New Jersey Highway Authority ... for [his] personal gain" between January and April 1992. The written notice indicated a disciplinary hearing would be held on April 20. The hearing, however, was adjourned on several occasions.

In the interim, on May 12, Adamczyk tendered a letter of resignation, which provided in pertinent part:

I am writing to ask that the New Jersey Highway Authority accept my resignation effective immediately. As you are aware on April 3, 1992 I was placed upon a leave without pay. Subsequent to that time I have involved myself with a therapist under the Resolve Program. It is my decision after conferring with that

---

[3] There is no indication in the record that "Adamczyk placed himself on an unpaid leave of absence[,]" as he stated.

therapist that I am unable to continue working in my present capacity because I am unable to carry out the duties of a supervisor and would therefore request that you accept my resignation.

NJHA rejected Adamczyk's resignation in a May 15 letter, which stated: "Please be advised that your letter of resignation ... is not acceptable."

On June 1, NJHA held a hearing and, on June 4, found Adamczyk guilty as charged and concluded:

> I hold that you should be terminated on each of the accounts for which you have been found guilty effective April 3, 1992. I further conclude that on the basis of these findings, that you receive no sick leave, vacation pay, or any other benefits which would have been due you in the absence of this action.

Adamczyk did not challenge his termination. Local 193, however, filed a grievance on his behalf, contending that NJHA "violated his rights under the Collective Bargaining Agreement by refusing to accept his resignation and by denying him payment for unused accrued sick leave, vacation, compensatory time and any other benefits which were due to him prior to his suspension on or about April 3, 1992." NJHA rejected that claim. The parties exhausted the grievance procedures outlined in their contract and then selected an arbitrator to hear the matter.

In the arbitration the parties agreed that Adamczyk sought three types of benefits: (1) unused sick leave, which equalled $16,182 (762.96 hours); (2) accrued vacation time in the amount of $1,102.71 (51.99 hours); and (3) compensation time, which Adamczyk admittedly owed NJHA $254.52. In total, Adamczyk sought about $17,000.

With respect to unused sick time, section XXII, paragraph two, of the contract states in pertinent part:

> Sick Leave is cumulative. An employee who retires or dies (to the estate) and who has completed at least one (1) year of service will receive payment of 100% of his/her unused Sick Leave entitlement based on a maximum of 300 days; those employees who resign with at least five (5) years and up to 10 years of service will receive a payment of 50% of their unused Sick Leave entitlement based on a maximum of 300 days; those employees who resign after ten (10) years of service will receive a payment of 100% of their unused Sick Leave entitlement based on a maximum of 300 days. *The aforementioned payments of accumulated unused Sick*

*Leave may not be payable to an employee who had been terminated as a result of a disciplinary action subject to the Grievance Procedure.* [emphasis added]

In regard to accrued vacation benefits, section X, paragraph eight, of the agreement provides that "[a]ny employee who resigns, or is separated, will receive pay in lieu of vacation on a prorated basis."

Additionally, section XI, paragraph six, of the subject agreement contains a resignation clause, which provides: "A Supervisor may resign at any time with all benefits to which he/she is entitled."

The agreement between the parties also contains a final and binding arbitration provision and states:

The award of an arbitrator upon any grievance subject to arbitration as herein provided shall be final and binding upon all parties to this Agreement, provided that no arbitrator shall have any authority or jurisdiction to add to, detract from, or in any way, alter the provisions of this Agreement.

Based upon these provisions, particularly the resignation clause, Adamczyk argued before the arbitrator that he had (1) an absolute right to resign on May 12, 1992; and (2) resigned prior to his termination by NJHA and, hence, was entitled to all his benefits. He pointed out that the contract "does not even indicate that the supervisor must be 'in good standing' to receive all the benefits to which he is entitled."

NJHA, on the other hand, argued that it had terminated Adamczyk "as a result of a disciplinary action" and, thus, section XXII, paragraph two, prohibited the payment of unused sick time. In addition, NJHA argued that Adamczyk submitted his resignation "with the intent of circumventing the disciplinary proceedings and escaping with additional benefits he would otherwise forfeit as a result of his long history of theft" and "had no intention of resigning prior to having his criminal activity exposed."

On November 23, 1992, the arbitrator rendered his decision in favor of Adamczyk, essentially reasoning that the "very broad statement" contained within the agreement permitting a supervisor to "resign at any time with all benefits to which he/she is

entitled" precluded NJHA from denying Adamczyk accrued sick and vacation time. The arbitrator also stated that the parties clearly intended to limit section XXII, paragraph 2, to those "individuals who had already been terminated."

NJHA filed a complaint on March 1, 1993, challenging the arbitration award and asserting that the arbitrator rendered his decision by undue means and exceeded the scope of his authority. On May 17, 1993, the return date of the order to show cause, the Law Division Judge denied the relief sought by NJHA and confirmed the arbitration award.

On appeal, NJHA argues: (1) the arbitrator rendered his decision by undue means, contrary to *N.J.S.A.* 2A:24–8(a); (2) the arbitrator exceeded the scope of his authority, contrary to *N.J.S.A.* 2A:24–8(d); and (3) the arbitration award violates public policy and, thus, the arbitrator should have required Adamczyk to forfeit his employment benefits.

■ It is axiomatic that courts favorably view arbitration of labor-management disputes. *See County College of Morris Staff Ass'n v. County College of Morris,* 100 *N.J.* 383, 390, 495 *A.*2d 865 (1985); *Barcon Associates, Inc. v. Tri–County Asphalt Corp.,* 86 *N.J.* 179, 186, 430 *A.*2d 214 (1981); *Kearny PBA Local No. 21 v. Town of Kearny,* 81 *N.J.* 208, 221, 405 *A.*2d 393 (1979); *PBA Local 160 v. Township of North Brunswick,* 272 *N.J.Super.* 467, 640 *A.*2d 341, 343 (App.Div.1994). There is, however, a distinction between public and private sector arbitration. *See Tretina Printing, Inc. v. Fitzpatrick & Associates, Inc.,* 135 *N.J.* 349, 640 *A.*2d 788 (1994); *Perini Corp. v. Greate Bay Hotel & Casino, Inc.,* 129 *N.J.* 479, 524, 610 *A.*2d 364 (1992) (concurring opinion) (majority opinion abrogated by *Tretina, supra* ). Arbitration is designed to provide a speedy, expeditious, and economic resolution of disputes and, whenever possible, should spell the conclusion to litigation rather than the beginning of it. *County College, supra* 100 *N.J.* at 390, 495 *A.*2d 865; *Barcon, supra* 86 *N.J.* at 187, 430 *A.*2d 214. Towards that end, judicial interference is generally limited. *See County College, supra* 100 *N.J.* at 390, 495 *A.*2d 865; *Barcon,*

*supra* 86 *N.J.* at 187, 430 *A.*2d 214; *Kearny, supra* 81 *N.J.* at 221, 405 *A.*2d 393; *City of Atlantic City v. Atlantic City Firefighters Local 198, IAFF,* 234 *N.J.Super.* 596, 601, 561 *A.*2d 307 (Ch.Div. 1989).

In *Kearny, supra,* the Court enunciated the standard for review of an arbitration award in a public sector [4] labor dispute, when it stated:

> In the context of public employment an arbitrator's determinations in binding arbitration are subject to pertinent statutory criteria as well as the public interest and welfare. In the private sector, the parties may authorize the arbitrator to determine legal issues as he deems fit irrespective of whether those determinations are in accordance with the law.... [I]n the public sector the parties do not have this choice, for public policy demands that inherent in the arbitrator's guidelines are the public interest, welfare and other pertinent statutory criteria.

*Id.* 81 *N.J.* at 217, 405 *A.*2d 393 (footnote omitted). *See State v. State Troopers Fraternal Ass'n of New Jersey, Inc.,* 91 *N.J.* 464, 469, 453 *A.*2d 176 (1982); *Barcon, supra,* 86 *N.J.* at 187–188, 430 *A.*2d 214.

Our Supreme Court emphasized in *Communications Workers, infra,* that "parties in a public employment case cannot clothe the arbitrator with unbridled discretion, 'for public policy demands that inherent in the arbitrator's guidelines are the public interest, welfare and other pertinent statutory criteria.'" *Communications Workers of America, Local 1087 v. Monmouth County Bd. of Social Services,* 96 *N.J.* 442, 450–451, 476 *A.*2d 777 (1984) (citations omitted); *Jersey City Educ. Ass'n Inc. v. Board of Educ. of City of Jersey City,* 218 *N.J.Super.* 177, 188, 527 *A.*2d 84 (App.Div. 1987).

*N.J.S.A.* 2A:24–8 delineates relevant "statutory criteria" under which a court should vacate an arbitration award and provides:

a. Where the award was procured by corruption, fraud or undue means;

b. Where there was either evident partiality or corruption in the arbitrators, or any thereof;

---

[4] Our discussion is limited solely to public sector arbitration. We recognize that a different standard exists for the private sector. *See Tretina Printing, Inc.,* 135 *N.J.* 349, 640 *A.*2d 788, 793 (1994).

c. Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause being shown therefor, or in refusing to hear evidence, pertinent and material to the controversy, or of any other misbehaviors prejudicial to the rights of any party;

d. Where the arbitrators exceeded or so imperfectly executed their powers that a mutual, final and definite award upon the subject matter submitted was not made.

"Undue means," as used in *N.J.S.A.* 2A:24–8(a), ordinarily encompasses situations where the arbitrator has made a mistake of fact or law that is either apparent on the face of the record or admitted to by the arbitrator. *PBA Local 160, supra,* 640 *A.*2d at 344. *See Fox v. Morris County Policemen's Ass'n,* 266 *N.J.Super.* 501, 514–515, 630 *A.*2d 318 (App.Div.1993); *Anco Products Corp. v. T.V. Products Corp.,* 23 *N.J.Super.* 116, 124, 92 *A.*2d 625 (App.Div.1952); *Held v. Comfort Bus Line,* 136 *N.J.L.* 640, 641–642, 57 *A.*2d 20 (Sup.Ct.1948). *See also McHugh Inc. v. Soldo Const. Co., Inc.,* 238 *N.J.Super.* 141, 145, 569 *A.*2d 293 (App.Div. 1990). Moreover, courts have "greatly enlarged" the concept of "undue means" in the public sector. *Old Bridge Tp. Bd. of Educ. v. Old Bridge Educ. Ass'n,* 98 *N.J.* 523, 527, 489 *A.*2d 159 (1985); *PBA Local 160, supra,* 640 *A.*2d at 344.

Furthermore, "[w]hen parties have agreed, through a contract, on a defined set of rules that are to govern the arbitration process, an arbitrator exceeds his powers when he ignores the limited authority that the contract confers." *County College, supra,* 100 *N.J.* at 391, 495 *A.*2d 865; *PBA Local 160, supra,* 640 *A.*2d at 344. The scope of the arbitrator's authority depends on the terms and conditions contained within the agreement between the parties and, properly, the arbitrator cannot disregard the terms contained therein nor can he or she rewrite the contract for the parties. *PBA Local 160, supra,* 640 *A.*2d at 344. As succinctly stated by our Supreme Court: "where an arbitration award does not draw its essence from the bargaining agreement, it will not be enforced by the courts." *County College, supra,* 100 *N.J.* at 392, 495 *A.*2d 865 (citation omitted); *PBA Local 160, supra,* 640 *A.*2d at 344.

Here, the arbitrator acted contrary to pertinent statutory criteria, as well as the public interest and welfare, inherent in his guidelines when he permitted Adamczyk to receive about $17,000 in employment benefits after internal agents caught him stealing tokens and money from NJHA.

In determining NJHA terminated Adamczyk on June 4, the arbitrator failed to recognize the purpose and effect of Adamczyk's suspension without pay pending a disciplinary hearing. The whole point of the suspension was to determine whether Adamczyk was guilty on April 3, 1992 of the charges brought against him and, if so, any disciplinary action taken by NJHA would take effect as of the date of the incident. It is logical to consider and utilize the April 3 date as the effective date from which to measure the impact of the disciplinary hearing proceeding, even though the hearing took place two months later because of contract and due process considerations, including the adjournments. Had NJHA not been able to establish that Adamczyk had stolen funds or if it turned out that it had mistakenly suspended Adamczyk for stealing he clearly would have been entitled to back pay from April 3. As NJHA would have been required to use that date to determine back pay and, in view of the public interest involved because a public agency and trust is involved, that date should be considered the applicable date from which disciplinary action flowed, including the effective date of termination at the conclusion of the administrative proceedings.

Thus, the arbitrator should have retroactively applied Adamczyk's termination to April 3, the day NJHA witnessed him taking a "few handfuls" of coins and tokens out of the vault, instead of using the June 4 date. Stated differently, the June 4 disciplinary hearing should have had the efficacy of confirming the April 3 suspension and converting it into a termination as of the date of the suspension. NJHA, therefore, does not have an obligation to compensate Adamczyk for unused sick leave pursuant to section XXII, paragraph two, of the collective negotiation agreement, nor reimburse him for vacation time. By applying the April 3 date,

Adamczyk obviously cannot recover his benefits because NJHA terminated him prior to the date he "resigned."

█ Even if we were to conclude that NJHA's termination of Adamczyk took effect on June 4, the award could still not stand because it was procured by "undue means," contrary to *N.J.S.A.* 2A:24–8(a), and the arbitrator "imperfectly executed" his authority, as proscribed by *N.J.S.A.* 2A:24–8(d). In the language of the exclusionary clause, Adamczyk "had been terminated as a result of a disciplinary action. . . ." In modifying this exclusionary clause by limiting it only to those "individuals who had *already* been terminated[,]" the arbitrator ignored the contractual provision contained in the contract that prohibited him from adding to, detracting from, or in any way altering the provisions of the agreement. He in essence negated the contractual provision for any instance where an employee facing serious disciplinary charges submits a resignation prior to conclusion of the proceedings.

Even if we also rejected a relation back approach and ignored the contract language as to sick leave, we would nonetheless set aside the arbitration award as it contravenes public policy. A public employee entrusted with public monies who is caught stealing those funds should not be able to receive employee benefits based upon a procedural hiatus, *i.e.*, the time between when he is caught and his hearing, particularly in light of the blatant criminality involved here. To allow this to happen would erode the already tarnished reputation and image of state government, foster ill will amongst honest state employees, and further fuel cynicism and mistrust towards government.

Furthermore, in awarding sick benefits, the arbitrator in essence granted Adamczyk a two month cushion to put his affairs in order prior to bearing any responsibility for his breach of the public trust. The effect was to allow a race to resignation before the grievance machinery could conclude. To put the point differently, the arbitration award condoned a "beat the clock" mentality, *i.e.*, could NJHA have afforded Adamczyk a full and fair hearing

before he sought to vest his benefits and before imposition of any penalties or exclusionary provisions contained in the contract. In our view such action cannot allow a defalcating public employee to betray the public trust by stealing public funds and avoid any impact with regard to his benefits.[5] Public policy militates against such a result.

In addition, applying the actual hearing date as the point of termination in the public sector, instead of the suspension date, may hamper the ability of government authorities to investigate and, most likely, will provide those public employees charged with a violation of the criminal law with a method to add insult to injury by collecting some funds from the public agency. Moreover, where a crime is involved, invocation of Fifth Amendment rights could well force further delays of administrative hearings. Had NJHA terminated Adamczyk prior to any grievance hearing[6] or had a hearing shortly after his suspension, Adamczyk would most likely complain on appeal of a violation of his contract rights or that he was denied due process because he did not have time to prepare a defense.

Although cognizant of the argument that Adamczyk should be entitled to his benefits irrespective of the reason NJHA discharged him because he had "earned" those benefits, it can fairly be said that public sector and public interest considerations clearly outweigh this lone factor.

In sum, the arbitration award fails to draw its essence from the collective negotiations of the parties, and because the arbitrator exceeded his authority and disregarded the contractual exclusion denying benefits, particularly unused sick days, to employees who had been terminated as a result of a disciplinary action, as well as

---

[5] The agency, however, might have a claim for restitution.

[6] We do not state that it had such an option here. Of course, this assumes no applicable contract grievance procedures. Such a termination usually would be found in an employment at will situation in the private sector.

the public policy interests involved, we vacate the order confirming the arbitration award and, accordingly, also vacate the award.